516 P.2d 732 (1973)
Lyman NICHOLS, Jr., III, Appellant,
v.
Kathryn Adelle NICHOLS, Appellee.
No. 1833.
Supreme Court of Alaska.
December 7, 1973.
Raymond A. Nesbett, Nesbett & Johnstone, Anchorage, for appellant.
David H. Bundy, Ely, Guess & Rudd, Anchorage, for appellee.
Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

OPINION
BOOCHEVER, Justice.
Lyman Nichols appeals from an October 1972 modification of a 1969 child custody decree. The parties to the action, Lyman Nichols, Jr. (Lyman) and Kathryn Adelle (Nichols) Mattison (Kay), were married in November 1956. The marriage was terminated by a decree of divorce issued in the Superior Court for the State of Alaska, Third Judicial District, October 24, 1969. Before the divorce was final, the parties engaged in heated contest extending in time from February 28 to June 18, 1969 regarding the custody of their two children: Bobby, born in 1961, and Jodi, born in 1964 and adopted by the Nichols shortly thereafter. At the conclusion of what certainly ranks among Alaska's most lengthy and thorough child custody proceedings, *733 Judge Harold J. Butcher awarded custody of the two children to the husband, Lyman.
In August of 1972, Kay filed a motion for change of custody. The matter was heard on October 20, 1972, in Anchorage by Judge Carlson who found that there had been sufficient change in circumstances since the date of the original award to justify modification of the award of custody of Jodi. Judge Carlson awarded Kay custody of Jodi, leaving Bobby with Lyman. It is from this modification that Lyman appeals.[1]
In the 1969 custody proceeding, Judge Butcher found that Lyman was a "fit and proper person" to have custody of the children, finding him to be a "capable and loving parent". The same proceeding resulted in findings that Kay had "exhibited during the marriage a pattern of extremely harsh discipline toward the children ... [resulting] in physical injury, cuts, and lacerations, and [that administration of this discipline] is detrimental to the health and well being of the children." The court further found:
The mother, plaintiff herein, has exhibited during the marriage a want of love toward her children and an absence of any deep maternal instinct toward their physical and mental well being. These personality and character traits of the mother result in her inability to cope with the day-to-day problems of rearing children on a mature and adult basis.
After also finding that the mother had been guilty of adulterous relations with one Ron Mattison, then a married United States Air Force nightclub entertainer, and that such "immoral conduct on the part of the mother has involved the children in the third-party relationship and has been detrimental to the best interests and welfare of the children", the court concluded: "The mother, plaintiff herein, is not a fit and proper person to have the care and custody of the parties' minor children."[2] The court also concluded from evidence of Mattison's lack of interest in the welfare of his own son by a former marriage that "a household in which Mr. Mattison is the father figure is not going to be a wholesome household for 2 small children."
Subsequent to the original custody decision, Kay married Mattison, and later they moved to Florida. Lyman Nichols also remarried in August 1969; that marriage *734 terminated by divorce in July of 1971. In 1972 Lyman moved from Anchorage to Cooper Landing, where he still resides with the two children.
In reaching his conclusion that the decree should be modified, Judge Carlson found that Lyman was a fit and proper person to have the care and custody of Bobby, and that Kay was a fit and proper person to have the care and custody of Jodi. He found changes in circumstances in that Jodi "has reached an age where she needs the care and comfort of her mother", that she would benefit from an environment that provides two parental figures, that Jodi loves and needs Kay, who in turn loves her, and that the passage of time itself is a change in circumstances.[3] The court further found that the minor children would not be harmed by being separated.[4]
In this appeal Lyman contends that the court erred and abused its discretion in finding the mother a fit parent in the absence of any evidence showing a change of circumstances since the original custody decree.
This court, in reviewing lower court child custody decisions, applies the "clearly erroneous" standard:
As we noted in Sheridan, our law now vests a very wide discretion in the trial court to determine where custody shall be placed. We will reverse the determinations of the trial court only where we are convinced that the findings of the trial court are clearly erroneous and the record indicates that an abuse of discretion has occurred. (citation omitted).[5]
We are thus faced with determining whether or not the trial court clearly erred in its findings pertaining to the modification of custody.
There is statutory authorization for such modification, AS 09.55.205 stating:

Judgments for custody. In an action for divorce or for legal separation the court may, during the pendency of the action, or at any time thereafter during the minority of any child of the marriage, make an order for the custody of or visitation with the minor child which may seem necessary or proper and may at any time modify or vacate the order. In awarding custody the court is to be guided by the following considerations:
(1) by what appears to be for the best interests of the child and if the child is of a sufficient age and intelligence to form a preference, the court may consider *735 that preference in determining the question;
(2) as between parents adversely claiming the custody neither parent is entitled to it as of right. (emphasis added).
The statute does not refer to a requirement of "change of circumstance" in order to modify a decree. We have discussed such a requirement, however, in King v. King[6] where we stated:
Certainly a court should not alter a previous custody determination without a reasonable basis for concluding that the best interests of the child dictate such a change. Without some change in circumstance there is no logical basis for a court to alter a determination which has once seriously and finally been made. To do so might well constitute an abuse of discretion. However, as we noted at the outset, both statute and decision make it clear that the paramount consideration is the best interest of the child. The concept of "substantial change" of circumstances is not a limitation on the discretion of the trial court to determine custody according to the best interest of the child. Rather, it may be considered simply a rule of judicial economy designed to discourage discontented parents from continually renewing custody proceedings.
In short, the "substantial change" of circumstances is not an initial obstacle which must be overcome by either party in order to have the court redetermine custody. It is simply one of the factors to be weighed in the balance by the court when a motion for modification of a divorce decree in respect to custody is made. (footnote omitted).
Applying the King test to the facts of this case, we are confronted with the question of whether there has been a sufficient showing that the best interests of the child, Jodi, will be served by modifying the decree so as to award custody of her to Kay. Although we do not consider change of circumstance to be "a limitation on the discretion of the trial court to determine custody according to the best interest of the child", a court must give great weight to a finding of unfitness by a trial judge who has heard exhaustive testimony and examined exhibits, including medical and psychiatric reports.[7]
Thus, in considering the custody questions involved, a trial court should, of course, be guided primarily by considerations of the welfare and best interests of the children. But due weight must be given to the findings made at the original hearing and a change in custody should not be ordered lightly. Children should not be shuttled back and forth between divorced parents unless there are important circumstances justifying such change as in their best interests and welfare.
Clark, in his text The Law of Domestic Relations in the United States, § 17.7, at 600, points out the danger in repeatedly modifying custody orders so
that the child will be disturbed and upset by the repeated changes. So far as can *736 be determined from the reported cases, courts are aware of this danger and are generally reluctant to modify existing custody arrangements, but so long as modification is possible, parents who wish to prolong the battle may be able to persuade a new judge to accede to their requests for a change in custody. The only cure for this evil is continued careful scrutiny of each case at the trial court level, coupled with the imposition of a heavy burden of persuasion upon the party asking for modification. (footnote omitted).[8]
This problem was discussed by the Wyoming Supreme Court in Laughton v. Laughton.[9] A mother had sought and obtained a modification of a prior decree gaining custody of the five-year old son. The Wyoming court reversed, stating that the essence of the appellee's argument was:
"That a change in circumstances under a previous decree, if needed at all only need show in the discretion of the Trial Court that the interests, the welfare of the child or children will be improved by a modification." (original emphasis deleted).

If this were the law a parent ... could recurrently appeal to the court for a change, disqualify the judge who made the last decree and hope to persuade some other judge that the former judge had made a mistake. The minds of men react differently and a state of facts which might inspire one mind to conclude the best interest of a child would be served under the control of one authority, would convince another mind to the belief that its best interest lay in giving custody to another... .
Viewing more favorably all the respondent's evidence, it may be summed up as showing that she had remarried and had a home in which to care for the child... . [W]e are unable to see how the welfare of the child would be improved or better served by giving effect to the latest order. The home life of children of wrecked marriages is difficult enough without adding to their other disadvantages the further disrupting influences attendant upon their custody being shunted from one parent to the other upon the occurrence of every slight change in condition. (emphasis added).
The court in Laughton stated the primary considerations as follows:
Neither party disputes and all courts agree that the paramount consideration in determining custody of a minor is the

Neither party disputes and all courts practicalities, this is the sole and only consideration, for to particularize by enumerating certain circumstances as affecting welfare, is merely to emphasize them as factors of that condition. But if changes in custody are made with every change in the marital status of divorced parents, the lives of children of these broken homes would be made miserable through recurrent efforts of parents to satisfy their own desires and the paramount purpose will be defeated. (emphasis added).[10]
Further consideration should be given to the desirability of not separating the children unless their welfare clearly requires such a course. As in other facets of the difficult problems confronting a trial judge in custody matters, there is no hard and fast rule. The question of whether or not it is necessary to separate children must depend upon the facts and circumstances of each particular case.[11]
It did not appear from the record that Judge Carlson had the benefit of a transcript *737 of material portions of the prior hearing, nor that he reviewed the exhibits filed therein, including medical, psychiatric and psychological reports pertaining to Kay.
In view of that record, the wellsupported findings of Judge Butcher with reference to the unfitness of the mother and the paucity of the evidence to the contrary presented at the modification hearing,[12] we are obliged to hold that the finding of fitness as to the mother was clearly erroneous, and accordingly that it was error to modify the decree.
The order modifying the decree is reversed.
Reversed.
NOTES
[1] Notice of appeal was filed on October 24, 1972, and on that same day Justice Erwin signed a stay order preventing change of custody prior to this court's decision on the merits of the appeal.
[2] Testimony supporting this finding catalogued the following incidents related by Lyman involving Kay and Jodi: continual pattern of conflict over meals, resulting in the girl being yanked by the arm out of a highchair when quite young and having her nose and mouth covered to force her to swallow when older; a broken arm that mysteriously appeared after Kay had been feeding Jodi dinner (Bobby suffered two broken legs under equally mysterious circumstances); unexplainable second degree burns on Jodi's buttocks; a disciplinary tactic of pinching Jodi's nose and covering her mouth to keep her from crying; a pattern of asking Jodi to accomplish impossible tasks followed by severe punishment for failure; spanking with a metal pancake spatula causing cuts and lacerations upon the bare buttocks; spanking on bare buttocks with bristle side of toilet brush, causing infection; violent shoving of the child causing numerous falls. A former babysitter corroborated testimony regarding the impossible mission game, stating that the punishment was a violent beating with fists. The babysitter witnessed the child being thrown into a drape-covered living room window. The babysitter also witnessed "spankings" administered with the spatula causing cuts and with the bristle side of a hairbrush. The babysitter confirmed the mealtime controversy testimony. A former fellow employee of Kay's testified that she saw Kay disciplining Jodi by twisting her arm and hair. A friend of Kay's testified to incidents of undeserved and "bordering on cruel" punishment. None of the third party witnesses was able to recount a single spontaneous display of affection by Kay toward Jodi. A former family doctor described Kay's "directed carelessness" as the cause of injuries to Bobby. A psychiatrist found Kay unresponsive to therapy; he considered her "not a good candidate for parenthood" and opposed her custody. Kay's testimony was evasive on several points. She generally denied the testimony of the witnesses; no witnesses appeared on her behalf.
[3] The passage of time as it affects the relationships of parties may bear relevance to a change of custody. Mere passage of time, however, is not of itself a change in circumstances sufficient to support modification. See Bernstein v. Bernstein, 80 Cal. App.2d 921, 183 P.2d 43, 45 (Ct.App. 1st Dist.Cal. 1947) (infant's becoming of age at which constant care is not required is sufficient to change decree to allow father to take child from home twice per month); but see Allen v. Allen, 200 Or. 678, 268 P.2d 358, 359 (1954) (approving finding that changes associated with adolescence are insufficient alone to modify decree). See generally 2 W. Nelson, Divorce and Annulment § 15.39 at 314, 315, nn. 46, 47 (2d ed. rev. 1961) and text accompanying.
[4] In his oral explanation of the decision Judge Carlson stated:

My intuition dictates that because this girl is now, I believe 8 years old, that she would be better off with the mother figure in the home... . As the situation confronts me and as I feel toward it, I'm going to change the custody of Jodi to her mother. I'm going to  I do that on the basis that there are 2 parental figures in the Mattison household. I rely upon Mr. Nichols' statement that he does not think that Mrs. Mattison would presently physically abuse the girl and I believe that from the responsiveness of the girl toward her mother as testified to here today, that it would be in that girl's best interest to go with her mother ... My basis for  additional basis is that I find that a lapse of time in and of itself can constitute part of a changed circumstance sufficient to warrant a change in custody. My major reliance, however, is upon the age of the girl, the fact that there are 2 parents in the Mattison  or 2 adult figures in the Mattison household and that the girl, in my opinion, needs the maternal model as well as a father.
[5] King v. King, 477 P.2d 356, 357 (Alaska 1970); accord Sheridan v. Sheridan, 466 P.2d 821, 824 (Alaska 1970).
[6] 477 P.2d 356, 359-360 (Alaska 1970).
[7] Normally a proceeding to modify an Alaskan decree would be conducted before the same trial judge who entered that decree. In this instance Judge Butcher withdrew after a motion to disqualify him was filed by Kay, and a new judge was obliged to pass on the motion to modify the decree. AS 22.20.022 authorizes a party or his attorney to file an affidavit alleging that he believes he cannot obtain a fair and impartial trial. The case must then be assigned to another judge. The affidavit, however, must be filed within five days after the case is at issue upon a question of fact, or within five days after the issue is assigned to a judge, whichever occurs later. There has been no appeal taken to us from the disqualification of Judge Butcher. We, therefore, do not pass on the question of whether a motion for modification of the decree is a continuance of the initial case, so that disqualification may not normally be secured by resort to AS 22.20.022.
[8] Cf. Schuler v. Schuler, 29 A.D.2d 669, 286 N.Y.S.2d 69 (1968); Application of Lang, 9 A.D.2d 401, 193 N.Y.S.2d 763 (1959).
[9] 71 Wyo. 506, 259 P.2d 1093, 1102 (1953).
[10] Id. at 1103.
[11] 2 W. Nelson, Divorce & Annulment § 15.18, at 257-58 (2d ed. rev. 1961).
[12] We note that the modification hearings indicate that there had been recent psychological or psychiatric examination of Kay, but that these reports were not furnished to the court by her.