Edward G. NICHOLS, Appellant,

v.

Crystal Marie MANDELIN, Appellee.

No. S–2922.

Supreme Court of Alaska.

April 27, 1990.

---

Edward G. Nichols, pro se.

Charlene A. Lichtman, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

FACTS AND PROCEEDINGS.

Edward and Crystal lived together from November of 1980 through July of 1983. On November 21, 1981, Crystal gave birth to a child, John. Edward is the natural father of this child. Following John's birth, until July of 1983, Edward and Crystal lived together.

In March of 1983 Crystal underwent a thirty-day alcoholism treatment program at a hospital. Edward testified that Crystal had driven John around in an automobile while intoxicated on one occasion. This occurred when John was a little more than one year old. On another occasion Crystal became intoxicated after an argument with Edward, and took John on a plane from Anchorage to Los Angeles. Additionally, Edward testified that there were "times when [he] would come home that Crystal would be incapacitated on the couch, and John would be wandering around the house." There is no testimony that any of these events took place after Crystal underwent alcohol treatment.

Following her initial alcohol treatment Crystal attended Alcoholics Anonymous. She testified that she has consumed alcohol since then, but there is no direct evidence that she has been intoxicated during that time. Friends testified that she conscientiously avoids alcoholic drinks when she socializes with them. Edward testified, however, that about six months prior to trial, he had been told by a babysitter hired

by Crystal that Crystal had passed out. The babysitter disputes this in her deposition. Edward additionally testified that he had other indirect information indicating that Crystal still consumed alcohol. The child custody investigator concluded, based on his review of statements by references and his interviews with Crystal, Edward and John, that alcohol is not currently a problem for either parent.

In July of 1983, Crystal moved out of the house the parties were sharing, taking John with her. Crystal testified that later in the month Edward forcefully took John away from her after a visit during which he had been drinking.

On July 22, 1983, Crystal filed for custody in Anchorage Superior Court. On July 29th the parties informed a superior court Master that they had reached a temporary agreement for month-to-month alternating custody. This lasted until September of 1983, when Crystal decided to give custody of John to Edward, and dismiss her custody complaint. Her original intent was for this arrangement to last for only eight or nine months. Crystal's proffered reason for temporarily conceding custody was that she was having financial difficulties, caused in part by the fact that she was supporting her younger sister. Furthermore, at the time, Crystal was working from 8:00 a.m. until 12:00 p.m. The parties agreed that Crystal could have visitation "virtually any weekend that she wanted," and that she could have four weeks of visitation during the summer. Crystal testified that support was discussed by the parties, but not provided since Edward "never requested it." Crystal did take John out to buy him $100 to $200 worth of clothes periodically. Also, she placed John on her insurance plan.

John remained in Edward's custody from September of 1983 through September of 1987. Edward worked in construction until September of 1987, and currently works as a coach for a swim team, and for the borough as a lifeguard.[1]

---

1. His work schedule has required him to use babysitters to take care of John. As of the May,

1988 trial Edward worked from 3:00 p.m. until 10:30 p.m. on Tuesdays through Fridays, and

Crystal's visitation with John has been erratic. Early in the arrangement Crystal was only able to see John about one weekend per month due to her long work hours. However, Crystal testified that after 1984 it was a "struggle" to schedule visitation with John. Between 1984 and 1987 visitation averaged about twice per month. She testified that while John was "copesetic" about visitation when she was able to contact him, contacting him has been a problem. Edward testified that he never called Crystal to offer visitation.[2] Edward also testified that while Crystal would have preferred summer visitation in four-week blocks of time, he generally only allowed her visitation in one-week blocks. There were exceptions, and during one summer he allowed Crystal a three or four week visitation period.

John's babysitter between 1984 and September of 1987 was Shawndra Petty. She was generally employed for five days per week, though sometimes she was needed on a sixth day as well. Shawndra took care of John at her home. Sometimes Shawndra would leave John with a neighbor, Joyce Knoller. Edward and Shawndra would talk about John's day for about 10 to 15 minutes when he went to pick his son up.

While Edward testified as to Shawndra's competence, Crystal had difficulty accepting the babysitting arrangement. She believed that John was becoming too attached to Shawndra, and expressed her concerns to Edward. Crystal notes that the record shows Edward allowed John to vacation with Shawndra's family each summer for one or two weeks. Also, John had called Shawndra "mom" for a period of a "couple of months," but at Crystal's objection, Edward had John call the babysitter by her first name.[3]

Edward further testified that while he tried to foster an open mother-child relationship between John and Crystal, the infrequency of Crystal's visitations was making this difficult. Edward's four years of continuous custody of John was disrupted in September of 1987. In July of 1987 Edward called Crystal to tell her of a six to eight week job opportunity he had in Bethel. The parties understood that the local job market offered little work, that the position in Bethel would be lucrative, and that Edward should take advantage of it.

Edward was living in Wasilla at this time. Crystal testified that as a result of the Bethel job, the parties had agreed that she would have visitation with John for the full month of August, and bring John to Shawndra's house in September to begin kindergarten in Palmer. Edward testified that he did not become aware of the job until mid-August, implying that visitation was only to begin at that time. Though Edward testified that Crystal agreed to this arrangement, Crystal testified that she had suggested John live with her and attend school in Eagle River, where she was living. Edward did not agree to Crystal's request, and left for Bethel in August with the parties agreeing to the initial plan. John was left with Crystal in mid-August.

---

2. In answer to a question during the court's voir dire of him on this subject, Edward explained:

I discussed it with her but I—on the occasions of the visitation I would not call during the week and say are you going to pick up John this weekend. I would wait for her to call me. I didn't want to be the initiator of visitation with her. I wanted her to be the one that initiated them.... I know that she was having problems with alcohol and I trust her judgment if she's having a bout with alcohol that weekend. I don't want to say do you

from 3:00 p.m. until 5:30 p.m. on Mondays. Additionally, he coaches swim meets on weekends, and has engaged in part-time dry walling assignments on weekends.

want John for fear of her saying yes and placing him in a situation that is not good for him.

3. The following voir dire of Edward by the court on this subject took place:

Q What was your reaction to his calling her mom?
A I was not—I was guarded about my reaction. I was—I thought it was okay as long as it didn't pose a problem with Crystal and if it gave comfort to Shawndra to have him call her mom, I figured it was just a word. I knew that Shawndra was providing things that a mother provides a child.
Q Is mom just a word?
A No, mom's not just a word.

**1370**

Crystal decided to bring John to school for his first day in September. She became disturbed upon finding that her name was not listed in the "school records." The parental information forms were left blank. Shawndra's name and address were provided in the spaces relating to John's home address and with whom he lived. The forms were apparently filled out by Shawndra. The next day Crystal called Shawndra's house to speak to John. Shawndra informed Crystal that John was no longer living with her, and that he would instead be living with Shawndra's neighbor, Joyce Knoller. Crystal then contacted an attorney, who advised her that she could pick John up from Joyce's house. She did not contact Edward because he had no contact number in Bethel.

Edward apparently assumed that John was staying with Shawndra at this time. When Edward found out about this turn of events he called Crystal, who informed him that she intended to retain custody of John. Edward then returned from Bethel and remained in Wasilla to "fight this ... matter." Crystal retained custody of John during September, October and November, and enrolled him at Ravenwood Elementary School in Eagle River.

In October Edward obtained an order from superior court for temporary custody. Initially, Edward allowed John to remain with Crystal, but on or about November 30th Edward exercised his right to take temporary custody of John. Crystal testified that Edward initially intended to further John's best interests by allowing him to complete the semester at Ravenwood before taking custody, but in November decided to take custody in order to better his chances of being awarded permanent custody. Edward agreed that he initially intended to allow John to remain at Ravenwood to complete the semester, but did not testify as to why he subsequently changed his mind.

Crystal expressed concern over the condition of the house Edward and John lived in. Prior to 1987 it was poorly heated, uninsulated, and had no kitchen or plumbing. It currently has electricity, insulation (exposed) and heat. During the weeks prior to trial a bathroom and kitchen were installed in the house. Crystal also testified as to the fact that that John wet his bed until the age of five. Edward did not seek professional help for John's problem. Edward decided it would be best if he handled the problem himself without making John self-conscious about being a bed-wetter. Additionally, the child custody investigator testified that Edward procrastinated in dealing with John's ear infections.

After trial the superior court awarded custody of John to Crystal. Edward was granted reasonable rights of visitation. The superior court found, in part, the following:

> During this period (1984 through 1987), Mr. Nichols delegated the task of raising the parties' minor child to the babysitter, Shawndra Petty, and she became the actual primary caretaker of the child.
>
> . . . .
>
> Mr. Nichols thereby encouraged a mother/child relationship between the babysitter and the minor child.
>
> . . . .
>
> This Court finds that Mrs. Wood is the parent who is better able to financially support the parties' minor child.
>
> . . . .
>
> This Court finds that the mother, Crystal Wood, is better able to provide for the physical and emotional needs of the parties' minor child.
>
> . . . .
>
> In his report dated May 12, 1988, and in his testimony, the custody investigator, John Hanscom, found that Mrs. Wood could better promote an open and loving and frequent relationship between the child and the other parent.
>
> ... This Court finds that Mr. Nichols unreasonably and without justification failed and continued to fail to afford Mrs. Wood the visitation to which she was entitled. . This Court further finds that Mrs. Wood is the parent who will better promote an open and frequent relationship between her child and Mr. Nichols.
>
> . . . .

This Court adopts the recommendation and finding of the custody investigator that Mrs. Wood is the parent who can offer the child greater stability.

. . . .

This Court finds that joint custody would not be in the best interest of the parties' minor child.

. . . .

The Court finds that Mrs. Wood is a fit and proper person to have the care, custody, and control of the minor child with reasonable rights of visitation to the Defendant. This Court further finds that it is in the child's best interest for Mrs. Wood to have sole custody of the parties' minor child.

## I. DID THE SUPERIOR COURT ERR IN NOT APPLYING THE "SUBSTANTIAL CHANGE IN CIRCUMSTANCES" TEST FOR PURPOSES OF DETERMINING CUSTODY IN THIS CASE?

▆ Transfer of custody from one parent to another may not be effectuated absent a finding that there has been a "substantial change in circumstances," and that the transfer will be in the best interests of the child. *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985). In *S.N.E.*, we observed that the interest in maintaining continuity of care to avoid subjecting the child to repeated custody changes forms the policy basis for this rule. Accordingly, we held that the substantial change doctrine should apply not only where the initial custody arrangement was by court order, but also where the arrangement was the result of a voluntary "stipulation" between the parties. *Id.* at 877–78. We further stated that where the original custody arrangement was not by court order, the "substantial change in circumstances" test will apply only when the custodial parent has had custody for a "significant time." *Id.* at 878.

In the case at bar the superior court ruled that since there was no stipulation of

custody in this case, as there was in *S.N.E.*, the substantial change in circumstances test would not apply. However, it appears clear that Edward's 4½-year custody of John, interrupted only during September–November of 1987, has the same effect as a voluntary stipulation, though no formal document was ever executed. Furthermore, this is not a case where one party obtained custody against the will of the other. Rather, the parties agreed to the arrangement in 1983. Crystal always had the option to file for custody between 1983 and October of 1987. We therefore conclude that the superior court erred in holding that a change in custody could be decreed absent a finding of "substantial change in circumstances."

## II. WAS THERE A SUBSTANTIAL CHANGE IN CIRCUMSTANCES IN THIS CASE?

The superior court, as an alternative to its conclusion that it was unnecessary to find a substantial change in circumstances, found that:

a substantial change occurred in September, 1987, when the babysitter, Shawndra Petty, who had been delegated by Mr. Nichols to raise the child, abruptly abandoned the care of the child. This Court finds that it was appropriate for Mrs. Wood to assume primary physical custody of the child after he had been abandoned by the babysitter and enroll him in the Ravenwood Elementary school.

The abandonment of the child changed any continuity that may have previously existed and necessarily meant a change in schools for the minor child and a change in the child's primary caretaker. These circumstances, and in view of other substantial changes which occurred since 1983, are more than sufficient to support the change of circumstance standard.[4]

It is established that "[w]e will only overturn a trial court's custody determination when there is a showing that the trial

---

4. The superior court also noted that Edward's withdrawal of John from Ravenwood constituted a change in circumstances. We disagree.

Edward's regaining custody, which was authorized by an interim order of the superior court, did not constitute a change in circumstances.

court's findings of fact were clearly erroneous, or that the court abused its substantial discretion in making its determination." [5]

In determining whether to modify a child custody decree, Alaska courts are governed by AS 25.20.110, which provides:

> An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interest of the child. If a parent opposes the modification of the award of custody or visitation with the child and the modification is granted, the court shall enter on the record its reason for the modification.

In a recent opinion we emphasized that "[i]n contrast to the initial award of custody, which, in disputed cases shall be granted 'on the basis of the best interests of the child,' modification of a custody award depends upon a change in circumstances." [6] This doctrine requires the non-custodial parent to show that circumstances have changed significantly since the prior custody order was entered before a court will consider modifying the existing custodial arrangement.[7] The rule is "... designed to discourage discontented parents from continually renewing custody proceedings." [8]

Our cases indicate that for a modification of custody to be justified, two circumstances must correspond: (1) the non-custodial parent must bear the burden in the modification proceeding of establishing that a change in circumstances has occurred,[9] and (2) the modification must be in the best interests of the child.[10]

■ We have concluded that it is unnecessary to decide, in the particular factual context of this case, whether a change in babysitter can constitute a substantial change in circumstances sufficient to support modifying a custody award.[11] It is evident that a substantial change has taken place in Crystal's circumstances. There is evidence in the record regarding Crystal's overall maturation, her changed marital status,[12] her full time employment since 1982,[13] and her sustained control of a former drinking problem.[14] We hold that in the aggregate, these factors constitute a substantial change in circumstances.[15]

**5.** *Starkweather v. Curritt*, 636 P.2d 1181, 1182 (Alaska 1981) (per curiam). *See also Faro v. Faro*, 579 P.2d 1377, 1379 (Alaska 1978); *Bonjour v. Bonjour*, 566 P.2d 667 (Alaska 1977) (factual findings in custody modification actions reviewed under clearly erroneous standard); *Carle v. Carle*, 503 P.2d 1050, 1053 n. 6 (Alaska 1972) (same); *DeHart v. Layman*, 536 P.2d 789 (Alaska 1975); *Nichols v. Nichols*, 516 P.2d 732 (Alaska 1973) (questions of law in custody modification actions reviewed under abuse of substantial discretion standard).

**6.** *Garding v. Garding*, 767 P.2d 183, 184–85 (Alaska 1989) (citation omitted).

**7.** *Id.*

**8.** *King v. King*, 477 P.2d 356, 360 (Alaska 1970).

**9.** *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985) (citations omitted).

**10.** *Veazey v. Veazey*, 560 P.2d 382, 386 (Alaska 1977); *Horutz v. Horutz*, 560 P.2d 397, 401 (Alaska 1977).

**11.** This is not to say that we are discounting the superior court's findings that Shawndra Petty abandoned the care of John and that this abandonment resulted in a change in schools for the minor child. It is clear that Edward's use of Shawndra as a babysitter, and his influence on John's school attendance, are relevant factors relating to Edward's fitness as a parent.

**12.** Crystal remarried in 1985 and has one child from this new marriage. This child was sixteen months old at the time the custody hearing was held in the instant case.

**13.** From 1982 through 1984 Crystal held the position of personnel sergeant for the Alaska National Guard.

**14.** The evidence relating to Crystal's handling of alcohol is discussed at the outset of this opinion.

**15.** In *Gratrix v. Gratrix*, 652 P.2d 76, 82 (Alaska 1982) we said:
> We have previously held that mere improvement in the position of one of the parties is not sufficient to justify a change in custody. *Nichols*, 516 P.2d at 736. Ken's recent remarriage and abstention from drinking were not proper grounds upon which to base a change in custody, especially given the short duration of this improved lifestyle.

In *Garding v. Garding*, 767 P.2d 183, 186 (Alaska 1989), we reiterated the notion that "mere improvement in the position of one of the parties is not sufficient to justify a change in custody," and further stated:

III. DID THE SUPERIOR COURT ABUSE ITS DISCRETION IN FINDING THAT A CHANGE IN CUSTODY WOULD BE IN JOHN'S BEST INTERESTS?

■ Review of the record indicates ample support for the superior court's conclusion that Crystal will provide a stable, loving environment for John. It can be inferred from the record that Edward allowed John to become too close to Shawndra. Additionally, inferences supporting the court's decision can be drawn from Edward's handling of John's schooling, bed-wetting and ear-infections. Given the discretion vested in the superior court in these matters, we hold that the superior court did not abuse its discretion in determining that it was in the best interests of the parties' minor child that Crystal be given custody.

Further, the court's finding that Crystal could better foster an open, loving relationship between John and the non-custodial parent than could Edward finds adequate support in the record.. Edward had limited John's visitation periods with Crystal to week-long periods. Crystal also promised to allow more summer visitation than Edward if awarded custody. Though Edward tried to justify limiting visitation periods as based upon fears for John's safety, we hold that the superior court did not abuse its discretion in impliedly rejecting this justification, and in finding that Crystal would encourage an open relationship with Edward if awarded custody.

> Where, as in the instant case, both parties' positions have improved, there is even less justification to modify the shared custody agreement and to award sole custody to one parent.
> *Gratrix* and *Garding* are distinguishable. Here, neither Crystal's remarriage nor her abstention from alcohol consumption are "recent" developments. Crystal's improvement in these areas is reflective of changes of longstanding duration in her lifestyle. Furthermore, this case is unlike the situation in *Garding*, where both parties' positions had improved. In the factual context of the case at bar, Crystal's self-improvement is unilateral. Thus, in holding

IV. DID THE SUPERIOR COURT ABUSE ITS DISCRETION IN FAILING TO AWARD JOINT CUSTODY IN THIS CASE?

■ The custody investigator recommended that Edward and Crystal share custody of John. The superior court rejected this recommendation on the grounds that Edward has not (1) consulted Crystal on issues of importance to John; (2) initiated contacts to schedule adequate visitation by Crystal; and (3) exercised good judgment in taking care of John. The court further found that: "Mr. Nichols has refused and continues to refuse to allow Mrs. Wood to have an open and frequent visitation with the parties' child, and to adequately communicate with her."

Our review of the record leads us to the conclusion that the superior court did not abuse its discretion in concluding that joint custody was inappropriate. There is evidentiary support for the superior court's sole custody award.[16]

AFFIRMED.

COMPTON, Justice, dissenting.

I dissent.

As I discussed in my concurrence to *Lee v. Cox*, 790 P.2d 1359 (Alaska 1990), I believe that under the language of AS 25.20.-110, modification of a child custody award is appropriate only if there is a substantial change in circumstances which materially impacts the particular child's best interests. *Cf. Houger v. Houger*, 449 P.2d 766, 773 (Alaska 1969) (modification of custody only appropriate "if it ha[s] been shown that since the date of entry of the judgment changed facts and circumstances *affecting*

that, in the aggregate, the aforedescribed significant longstanding changes in Crystal's lifestyle constitute a change in circumstances, we distinguish *Gratrix* and *Garding* on the basis that these decisions were not intended to preclude a trial court from finding that significant long term changes in a party's lifestyle could constitute a substantial change in circumstances in determining child custody modification issues.

16. We have reviewed Edward's remaining specifications of error and conclude that they are without merit.

*the welfare of the children require[s]* modification for the best interests of the children.") (Emphasis added). Any material impact on this child as a result of a change in the economic status and substance-abusing habits of the non-custodial parent is purely speculative. A generalized improvement in the status of Crystal does not *require* modification of this established custodial arrangement.[1] While Crystal is to be commended for overcoming her personal obstacles, no showing has been made that this alone has had a material impact on John. No sufficient showing of changed circumstances having been made, no "best interests" inquiry should be undertaken.

Moreover, this court has held that "mere improvement in the position of one of the parties is not sufficient to justify a change in custody." *Garding v. Garding,* 767 P.2d 183, 186 (Alaska 1989) (quoting *Gratrix v. Gratrix,* 652 P.2d 76, 83 (Alaska 1982)). This is true even if the improvement is of extended duration and the improvement unilateral. *Starkweather v. Curritt,* 636 P.2d 1181, 1182 (Alaska 1981) (per curiam) (modification of custody decree denied despite finding that mother, who relinquished custody of children three years earlier in response to state petition to terminate her custodianship, was excellent custodian). If such an improvement, standing alone, cannot justify a change in custody, then neither can it justify reopening the issue of custody. Neither of the court's grounds for distinction (recency or sole improvement) distinguish *Starkweather.*

Moreover, the court, in distinguishing *Garding* on the grounds that both parents showed improvement, gives no weight to improvements shown by Edward, most notably the significant efforts he has undertaken to improve his housing conditions and finding local, reputable employment in the field of education. Thus, this case is indeed much like *Garding;* "there is even

less justification" to award Crystal sole custody where both parents have markedly improved. *See Garding,* 767 P.2d at 186.

*Starkweather* and *Houger* aside, the court's efforts to distinguish *Garding* and *Gratrix* do not answer our most basic difference. Courts will now need to determine whether a unilateral improvement is of "recent" vintage or is "long term." Such distinctions encourage potentially damaging, annual rituals of attacks against stable custodial relationships. Where one perfectly adequate parent has remained so, even for many years, a previously inadequate parent may now, without more, seek to relitigate custody. Indeed, under the court's rationale, the longer (and presumably more stable) the custodial relationship, the greater the justification to re-open old wounds, assuming the previously inadequate parent has not slipped back into inadequacy.

---

1. It may be that in some circumstances a change in only the non-custodial parent's circumstances will have a material impact on the child's best interests. For example, a child has an illness treatable only through constant care at a clinic in Rochester, Minnesota. Neither the

custodial nor non-custodial parent can afford to move to Minnesota. The non-custodial parent then gets a job transfer to Minnesota. Such a change in circumstances could materially impact the child's best interests.