Elizabeth L. LEE, Appellant,

v.

Geral L. COX, Appellee.

No. S–3084.

Supreme Court of Alaska.

April 27, 1990.

William T. Ford, Anchorage, for appellant.

Julie A. Clark, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.·

## OPINION

BURKE, Justice.

Elizabeth Lee appeals from the decision of the superior court which changed physical custody of her minor child to Geral Cox, the father.

### I

On February 2, 1980, Elizabeth Lee and Geral Cox were married. Their son, Derek

Lee Cox, was born on August 16 of the same year. On February 14, 1984, they dissolved their marriage. The dissolution decree did not specifically address the primary physical custody of Derek; however, under the provisions of the decree, Geral was to have visitation on Tuesday and Thursday evenings and on the weekends. For approximately four years, Geral spent nearly every weekend with his son. Elizabeth had physical custody of Derek the rest of the time.

In October 1987, Elizabeth informed Geral that she planned to move to Washington state. In November, Geral filed a Petition for Change of Physical Custody and Support and for Clarification of Decree of Dissolution.

Previously, Elizabeth and Geral agreed that they would not remove Derek from Alaska without the express written consent of each party or a written court order. In April 1988, Elizabeth filed a motion requesting that she and Derek be allowed to "temporarily leave the State of Alaska" and to "relocate" in Washington. The motion was granted. At the same time, Judge Carlson set a hearing date for July 5 which was continued until August 16. At the end of April, Elizabeth and Derek moved to Washington.

On August 16, 1988, the trial court changed the physical custody of Derek to Geral.[1] Additionally, Elizabeth was ordered to (1) return Derek's belongings, clothes and toys; (2) reimburse Derek's permanent fund money by establishing a trust account in an Alaskan bank by October 15, 1988; (3) file a financial declaration by August 25, 1988; and (4) pay child support as ordered on or before September 1, 1988.

On August 25, 1988, Geral filed a motion to require a supervisor during Elizabeth's visitation periods with Derek. In September, Judge Carlson ordered supervised visitation until Elizabeth (1) deposited Derek's permanent fund money in an Alaskan bank, and (2) obtained employment and permanent living quarters. Judge Carlson further ordered Elizabeth to establish a permanent fund dividend trust account for Derek and signed the custody decree.

On September 28, 1988, Elizabeth filed a motion for reconsideration and partial new trial so that the testimony of custody investigator Katherine Yeotis could be considered. Judge Carlson set the hearing for November 8.

On October 12, Judge Carlson denied the motion for reconsideration, and signed the final findings of fact and conclusions of law. The findings, however, were never

1. Written findings were not entered until October 12, 1988. They provided, in relevant part:
    1. In a matter involving the custody of a child, one of the questions the court must decide is whether the child is being parented or the parent is being parented by the child. This court is left with the firm impression that the child is parenting his mother or his mother would choose to have him do so.
    2. That Ms. Lee has interfered with the boy having a healthy relationship with his father, and that Mr. Cox is more likely to promote and permit a healthy relationship for Derek with his mother.
    █ The court finds that the claim of domestic violence by Ms. Lee against Mr. Cox on Saturday night, August 13th has not been proven and is [symptomatic] of the problems that have been going on for many years in this case.
    █ The court finds no reasonable basis as to why Derek was not returned to his father on Sunday morning, August 14. Blue jeans with popsicle stains on them are not a good reason for restricting visitation.
    █ The court finds that the mother used language that is very deleterious to the child when made in the presence of the child. Whenever a parent makes disparaging remarks about the other parent, it puts the child in a very stressful situation.
    █ This court believes Mr. Rosenbaum concerning a diamond ring which Ms. Lee claimed he gave her and which he claimed was intended for his fiancee because no one challenged his testimony. There was sufficient proof that this had occurred because of the newspaper advertisement advertising the ring for sale.
    █ This court also believes Mr. Frank Cox and his statement regarding derogatory remarks and it seemed consistent with other statements made that Ms. Lee loses her temper. There is no question that Mr. Geral Cox loses his temper too, but this court finds that he is the more fit parent to have the care and custody of Derek, now age eight.

distributed pursuant to Alaska Rule of Civil Procedure 58.1.

On November 3, Geral filed a motion requesting Elizabeth be held in contempt of court. At the November 8 hearing, the trial court refused to hear the testimony of Yeotis stating "this case has been tried, it's over. The next place it goes is to the Supreme Court of the State of Alaska...."

On November 9, Judge Carlson found Elizabeth in contempt of court for (1) failing to turn over Derek's personal belongings to Geral, (2) failing to restore the permanent fund dividends, (3) failing to file a child support guidelines affidavit, and (4) failing to pay child support.[2] Elizabeth was ordered to comply with the contempt order by November 15, 1988. On November 23, Judge Carlson ordered that Elizabeth be incarcerated until she complied with the court order. On November 26, Elizabeth was arrested; shortly thereafter, we partially stayed the contempt proceedings and ordered her release. Elizabeth appeals.

## II

### A. *Physical Custody*

Elizabeth asserts that the trial court abused its discretion in changing the physical custody of Derek to Geral because there was no significant change in circumstances. Geral asserts that Elizabeth's move to Washington and her interference with the father-son relationship are significant changes in circumstances justifying the change in custody.

In determining whether to modify a child custody decree, we are governed by AS 25.20.110, which provides in part that "[a]n award of custody of a child ... may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interest of the child."[3] A modification of custody requires a preliminary showing of a substantial change in circumstances.[4] *Garding v. Garding*, 767 P.2d 183, 184–85 (Alaska 1989).

■ We have held that a custodial parent's decision to leave the state constitutes a substantial change in circumstances for purposes of this preliminary showing. *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989). This, however, does not necessarily result in a change of custody. Rather, it entitles the non-custodial parent to a hearing to consider whether, in light of such changed circumstances, it is in the child's best interest to alter the existing custodial arrangement. *Id.* At such a hearing, the burden is on the non-custodial parent to demonstrate that the changed circumstances, considered in conjunction with other relevant facts bearing upon the child's best interests, warrant modification of the custody decree. *See Garding*, 767 P.2d at 185.

■ In the instant case, the primary "changed circumstance" on which Geral relies on appeal, i.e., Elizabeth's decision to leave the state, was never found by the trial court to negatively affect the child's best interests or to merit a change in custody.[5] Indeed, this factor, despite its obvious

---

**2.** Elizabeth was also ordered to pay $300 a month in child support, a $298 electric bill and $725 in attorney's fees.

**3.** AS 25.20.110 provides:

An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child. If a parent opposes the modification of the award of custody or visitation with the child and the modification is granted, the court shall enter on the record its reason for the modification.

**4.** Trial courts are vested with broad discretion in child custody determinations; we will not

reverse the decision unless an abuse of discretion exists. *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985).

**5.** Most states will permit a custodial parent to move out of the state with their children as long as there is a legitimate reason for the move. 1 J. Atkinson, *Modern Child Custody Practice* § 7.01, at 390 (1986); *see also Gooch v. Seamans*, 6 Ark.App. 219, 639 S.W.2d 541 (1982) (granting mother's petition to remove the children from the state); *Casida v. Casida*, 659 P.2d 56 (Colo.App.1982) (custodial parent is permitted great latitude in carrying out the custodial responsibilities of providing a primary home for the minor children of the parties, discretion may include removal of the child from the state

relevance, is never *mentioned* by the trial court in its oral or written findings in support of its custody decision. In light of the trial court's failure to render findings concerning the impact of this important change on the child's best interests, we are unable to adequately evaluate the correctness of the court's decision to modify the custody decree.[6]

Although the court did attempt to enumerate a number of relevant "best interest" findings in support of its custody decision, such findings, standing alone, are insufficient in this case to justify modification of custody under AS 25.20.110. First, we find unhelpful the court's observation that this is a case in which "the parent is being parented by the child."[7] The meaning of this statement is entirely unclear in the present context. The court made no finding that the child ever assumed a supervisorial role with regard to Elizabeth, or that he demonstrated a level of maturity which exceeded Elizabeth's own, neither is

such "parenting" readily apparent from our review of the record.

Moreover, the court's findings that "Ms. Lee interfered with the boy having a healthy relationship with his father" and that "Mr. Cox is more likely to promote and permit a healthy relationship for Derek with his mother," while supported by some evidence in the record, do not appear to be based upon such substantial actual obstruction of Geral's visitation rights by Elizabeth as to constitute "a change in circumstances [which] *requires* ... modification ... in the best interest of the child." AS 25.20.110 (emphasis added); *see also, Garding,* 767 P.2d at 185 (insufficient evidence to support trial court's finding that parents were "unable to cooperate ... to the extent necessary to make custody work").

Finally, the court's references to a few instances in which Elizabeth may have made "disparaging remarks" about Geral or used harsh language in Derek's presence is insufficient to justify a change in custody under AS 25.20.110.[8]

as long as the child's best interests are served); *Cole v. Cole,* 224 Mont. 207, 729 P.2d 1276 (1986) (travel restrictions are not in the best interest of the children); *Jensen v. Jensen,* 211 Neb. 537, 319 N.W.2d 75 (1982) (minor child allowed to leave jurisdiction with custodial parent as long as child's best interests are served); *Adams v. Adams,* 55 Or.App. 366, 637 P.2d 1358 (1981) (child was affected by parents hostility, however, change in custody was not warranted).

**6.** The dissent contends that it was unnecessary for the trial court to expressly rule upon the effect of the proposed move on the child. Citing *House,* 779 P.2d 1204, the dissent implies that the move, having served its role as prima facie proof of "changed circumstances," is no longer an essential part of the custody modification analysis. Such reasoning fundamentally misperceives the import of our decision in *House.* Although we held in *House* that a potential out-of-state move entitles the non-custodial parent to a judicial hearing at which *all* "best interest" considerations may be aired, we did not hold that such a move is, as a matter of law, a change in circumstances which "requires the modification" of the award, or that the effects of the move may be left altogether out of the best interest analysis. On the contrary, in *House* we concluded that the move tended to militate in *favor* of a child's best interests where needed handicapped services were more readily available out of state. *Id.* at 1208.

As this court observed in *Gratrix v. Gratrix,* 652 P.2d 76, 83 (Alaska 1982):

[W]hile it may be possible for a court to change custody absent any showing of an alteration in circumstances since the previous custody determination, *this important factor must be specifically considered by the court in ruling upon motions to modify custody.* (emphasis added; footnote omitted); *see also Poesy v. Bunney,* 98 Idaho 258, 561 P.2d 400, 403–04 (1977) ("The important portion of the [changed circumstances] standard is that which *relates the change in conditions to the best interest of the child....* The court must look not only for changes of condition or circumstance which are material, permanent and substantial, but also must *thoroughly explore the ramifications, vis-a-vis the best interest of the child, of any change which is evident."* (emphasis added.)). In this case, the record is devoid of any findings "specifically consider[ing]" the impact of the move on Derek's best interests. There was no attempt made to "explore the ramifications" of this change "vis-a-vis the best interests" of the child, nor to "relate" this change to other best interest considerations. Accordingly, on the facts of this case, we conclude that the trial court's findings are insufficient to support the modification decision.

**7.** The court later described this finding as "the nut of this case," in its view.

**8.** The court's observation that both parents lose their temper at times appears to be neutral at best. Its remaining findings do not directly relate to the "best interest" determination.

In sum, while the foregoing facts, *combined with* a finding that Elizabeth's move to Washington is detrimental to Derek's best interests, might suffice to justify a change in custody, these findings are in themselves insufficient to support the court's order. Accordingly, we reverse the custody modification and remand for further findings on the effect of the changed circumstances, particularly the effect of the move to Washington, on Derek's best interests.[9]

### B. *Permanent Fund Dividends*

■ Elizabeth asserts that the trial court abused its discretion by ordering her to reimburse Derek for all permanent fund dividends received on his behalf. We agree.

Geral properly concedes that "there is no law in this state requiring parents to set aside their children's permanent funds." *See, e.g., L.A.M. v. State*, 547 P.2d 827, 832–33 n. 13 (Alaska 1976) (enumerating among those "parental rights" protected by the constitution "the right to control and manage" a minor child's earnings and property); *see also* AS 43.23.005(c) (parent, guardian or authorized representative may claim permanent fund on behalf of a minor). Moreover, the record contains no findings by the trial court which support Geral's assertion that the parties contractually agreed to set aside the permanent fund monies. In the absence of such findings, the record is insufficient to provide this court with a clear understanding of the trial court's decision ordering return of the permanent fund monies. *See Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 236 n. 16 (Alaska 1982); *Wigger v. Olson*, 533 P.2d 6, 7–8 (Alaska 1975).

Accordingly, the trial court's decision on this issue is reversed and the matter is remanded for further findings on Geral's contract theory.

### C. *Contempt*

The trial court found Elizabeth in contempt of court for failing to comply with its various orders. Accordingly, it ordered that Elizabeth be incarcerated until such time as she either (1) paid Geral $5,429.89 and demonstrated that she had arranged shipment of Derek's belongings, or (2) requested a hearing and made a showing of her inability to comply with the court's orders.

In light of our conclusion that some of the court's underlying rulings must be reversed for lack of adequate findings, we also reverse the trial court's "Order of Arrest on Civil Contempt," dated November 23, 1988, which was based on Elizabeth's failure to comply with the court's earlier orders.[10] However, if, on remand, Elizabeth continues her recalcitrance with regard to any order of the court now in existence or rendered in the future, the court may take adequate steps to enforce its decree by use of its contempt power.

REVERSED and REMANDED.

COMPTON, Justice, concurring.

I concur with parts B and C of the opinion of the court, and with the result of part A, remanding the case for further findings concerning the impact on Derek of a move to Washington. However, I believe that the court misapprehends what is required in the way of demonstrating a "substantial change in circumstances" sufficient to relitigate child custody.

AS 25.20.110 provides that "[a]n award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances *requires the modification of the award* and

---

9. In light of our conclusion with regard to the custody issue, we need not reach Elizabeth's contention that the trial court erred in ordering supervised visitation for Elizabeth. We note, however, that any order of supervised visitation entered on remand should be supported by appropriate findings demonstrating a specific need for supervision on the facts of this case.

10. The order to return Derek's belongings may be mooted on remand should the court opt to leave custody of Derek with Elizabeth. Likewise, the majority of the funds ordered returned are attributable to the disputed permanent fund monies, which are subject to relitigation on remand.

the modification is in the best interests of the child." (Emphasis added). The statute on its face does not authorize a modification for *any* substantial change in circumstances; rather it permits a modification when "circumstances require." The question that now arises is *what kind* of circumstances? AS 25.20.110, while not a model of clarity, seems to answer the question: circumstances which directly impact this particular child's best interests.

We have often said that the paramount concern in child custody decisions is the child's welfare and not the parent's wishes. *E.g.*, *S.N.E. v. R.L.B.*, 699 P.2d 875, 877 (Alaska 1985). Accordingly, before it can be said that a change in circumstance *requires* modification of an award, the change in circumstances must suggest a direct impact on the particular child, whether beneficial or detrimental. Only after such a showing has been made should a court undertake a new "best interests" inquiry. A change in circumstances having a substantial impact on the life of one parent, yet little impact on the particular child, positive or negative, does not suffice to justify uprooting an otherwise stable custody arrangement. *Cf. S.N.E.*, 699 P.2d at 878 (to constitute a substantial change in circumstances, conduct of the parent must have an actual impact on the child).

In *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989), I joined in an opinion which held that a showing of "likely detriment" is not required to reopen the question of custody; rather the mere fact of an out-of-state move sufficed. Further reflection has convinced me that AS 25.20.110 requires at least some evidence of a direct impact on the child before a comprehensive inquiry into the child's best interests should be again undertaken. Although it may often be the case that an out-of-state move by the custodial parent will have such a direct impact on the child by interfering with the other parent's visitation, this is not necessarily true. A visitation scheme may be such that an out-of-state move has little or no impact on visitation (i.e., the parents live in different regions of Alaska and the child travels to see the non-custodial parent on alternative holidays and in the

summer, or a visitation scheme may have been abandoned by the non-custodial parent, such that little if any visitation is lost). Or despite a substantial impact on visitation, restructuring visitation will not negatively impact the existing stable custodial relationship and will adequately foster benefits flowing to the child from visitation.

In the instant case, the findings are simply devoid of analysis concerning whether Elizabeth's proposed move to Washington would impact Derek at all. Draft opinion at 1361–1362. On this record we can only speculate. Accordingly, I agree that the custody determination should be reversed and remanded for further findings.

MATTHEWS, Chief Justice, with whom RABINOWITZ, Justice, joins, dissenting.

I disagree with what appears to be a requirement that the trial court expressly link the substantial change of circumstances—Elizabeth's move from Anchorage to the state of Washington—to a negative effect on Derek. In my view, once there is a substantial change of circumstances, the function of the trial court on a motion to change custody is to make a custody award which, under all the circumstances, is in the best interests of the child. We stated as much in *House v. House*, 779 P.2d 1204 (Alaska 1989):

A court will modify an existing custody arrangement only when "a substantial change in circumstances requires the modification of the award and the modification is in the best interests of the child." AS 25.20.110....

When the child has been on a relatively stable custody-visitation schedule for a period of time and the primary custodial parent decides to leave the state, the child is faced with a potentially disturbing and upsetting change in circumstances. The child is likely to have less frequent contact with the non-custodial parent who continues to reside in the state. Existing visitation arrangements assume that the parents will continue to live in the same geographic area, and thus will require modification and change when

distances increase between the child and the non-custodial parent.

The purpose of maintaining stability in custody arrangements is thus defeated by the custodial parent's decision to leave Alaska. We therefore hold that the custodial parent's decision to leave the state with the children constitutes a substantial change in circumstances. If the parents cannot agree on a mutually-acceptable custody and visitation arrangement, the non-custodial parent is entitled to a judicial hearing to resolve whether the best interests of the child require a change in the existing custody or visitation order. . . .

[The non-custodial parent] need only show a change in circumstances before being entitled to a hearing on the children's best interests.

*Id.* at 1207–1208 (footnotes and citations omitted).

The error of the majority opinion in this case is in running together the separate requirements of changed circumstances and best interests of the child. The majority opinion states: "At such a hearing, the burden is on the non-custodial parent to demonstrate that the changed circumstances, considered in conjunction with other relevant facts bearing upon the child's best interests, warrant modification of the custody decree." *See supra.* The applicable statute, AS 25.20.110, clearly separates the requirements of changed circumstances and best interests with the word "and". The statute states in relevant part:

> An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award *and* the modification is in the best interest of the child. (Emphasis added.)

We recently emphasized the distinct nature of the requirements in *Nichols v. Mandelin,* 790 P.2d 1367 (Alaska 1990):

> These authorities indicate that for a modification of custody to be justified, two circumstances must correspond: (1) the non-custodial parent must bear the burden in the modification proceeding of establishing that a change of circumstances has occurred, and (2) the modification must be in the best interests of the child.

*Id.* at 1372 (footnotes omitted). In *Nichols* the change of circumstance was a change in the habits of the non-custodial mother from that of an out-of-control substance abuser to a follower of an abstemious lifestyle. This change obviously did not negatively affect the child or the existing custodial arrangement with the father. Nonetheless, we held that it was sufficient to warrant the best-interests inquiry. *Id.* at 1372.

Since it is clear in this case that there was a substantial change in circumstances, the question was whether custody with the mother, or with the father, was in the best interests of the child. Judge Carlson recognized this[1] and found that the father was the more fit of the two parents to exercise custody. In my view, for the reasons that follow, this finding is not clearly erroneous.

In *S.N.E. v. R.L.B.,* 699 P.2d 875, 878 (Alaska 1985), we stated, "[t]rial courts are vested with broad discretion in child custody determinations. The question upon review is whether the 'record shows an abuse of discretion or if controlling factual findings are clearly erroneous.'" (Citation omitted.) Also, because this case involved presentation of conflicting evidence, it should be remembered that "[i]t is the trial court's function, and not that of the reviewing court, to judge the credibility of the witnesses and to weigh conflicting evidence. . . . This is especially true where the trial court's decision depends largely upon oral testimony." *Penn v. Ivey,* 615 P.2d 1, 3 (Alaska 1980) (citations omitted). *See also* Civil Rule 52(a) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

---

1. Judge Carlson stated: "We have either Washington or Alaska, either the mother or the father. That is the state of this record."

Judge Carlson found that Elizabeth interfered with Geral's and Derek's father-son relationship, and that Geral was more likely to promote a healthy relationship between Elizabeth and Derek. In making this finding, Judge Carlson relied on an incident of disagreement between Elizabeth and Geral which resulted in Elizabeth's refusal to permit visitation and was thus "symptomatic" of their problems. Additionally, four witnesses testified to several other instances in which Elizabeth denied Geral visitation.

In making the finding that Elizabeth interfered with Geral's and Derek's relationship, Judge Carlson also relied on evidence that Elizabeth made "disparaging remarks" about Geral and other family members in Derek's presence. Frank Cox, Derek's grandfather, testified that at a family gathering Elizabeth "grabbed Derek and start[ed] out the door with him ... she turn[ed] to me and said, and you'll never see him again, you [expletive deleted]...."

Judge Carlson made the following finding with respect to Frank Cox's testimony: "I also believe Frank Cox and his statement and it seemed *consistent* with other statements which have been made." (Emphasis added.) Consistent with the testimony of Frank Cox was that of Geral Cox, who testified that, in front of Derek, Elizabeth told him "you're history, [expletive deleted]." [2] Also consistent with Frank Cox's testimony was that of Sherry Fenton, Geral's sister, who testified: "I have been on the receiving end of telephone calls [with Elizabeth] where [Geral] is being bad-mouthed and I can hear Derek ... playing in the background...."

Moreover, there is other evidence which, if believed, lends additional support to Judge Carlson's finding that Elizabeth interfered with Geral's and Derek's father-son relationship. Geral testified that during his visits with Derek, Elizabeth would often call on the telephone and as soon as she and Derek finished talking "[Derek] would be crying and upset, very confused

and disturbed.... But, right up until the point where the phone call came along, this kid's happy go lucky...." Geral described one particular call in which he claimed to have overheard Derek say "I love you too, mom" or "I miss you too, mom" thirty times in nineteen minutes.

Mark Rosenbaum, a former friend of Elizabeth, testified that Elizabeth and Derek appeared to share a close relationship, "to the exclusion of the rest of the world...." Similarly, Sherry Fenton testified that:

> at family gatherings if Derek fell down and was hurt or if he became upset like little kids do, if Geral tried to go and comfort Derek, [Elizabeth] would physically move Geral aside and ... tell him let me do it.... [I]f Geral tried to discipline Derek, ... [Elizabeth] would also interfere in that.

In light of such evidence, it cannot be said that Judge Carlson's finding that Elizabeth interfered with the father-son relationship was clearly erroneous.

In his best-interest finding, Judge Carlson also stated: "Ms. Lee loses her temper. There is no question that Mr. Geral Cox loses his temper too, but this court finds that he is the more fit parent to have the care and custody of Derek...." The majority characterizes this finding as "neutral at best." *See supra* n. 8. I disagree. The clause, "but this court finds that he is the more fit parent," clearly suggests that Judge Carlson found Elizabeth's temper to be more problematic than Geral's.

Again, there is much evidence in the record which, if believed, lends support to this finding. Geral testified that Elizabeth physically attacked him, including one occasion when Elizabeth threw a pair of scissors at him while he was holding Derek, and another occasion when Elizabeth aimed a loaded pistol at his head. When asked if Elizabeth has a "bad temper," Sherry Fenton testified, "[o]h definitely.... [S]he has unleashed it on various members of our ... family." Similarly, Frank Cox testified

---

**2.** Geral also testified that, on many occasions, Elizabeth threatened to prevent Geral from see-

ing Derek, and that these threats upset Derek.

about Elizabeth's propensity to "fly off the handle and start using profanity or demonstrating her temper on some of the other family members."

In light of such evidence, it cannot be said that Judge Carlson's findings with respect to Elizabeth's fitness as a parent and her interference with the father-son relationship were clearly erroneous. To be sure, Elizabeth attempted to rebut much of this evidence. The question of credibility, however, and the weight to be given the evidence was for Judge Carlson, the trier of fact, and should be deferred to by this court. In this regard, Judge Carlson's findings make it clear that he was less persuaded by Elizabeth's evidence than other conflicting evidence. For example, Judge Carlson stated that he "believe[d] Mr. Rosenbaum concerning a diamond ring which [Elizabeth] claimed he gave her and which he claimed was intended for his fiancee...." Judge Carlson also "believe[d] Mr. Frank Cox and his statement regarding derogatory remarks and it seemed consistent with other statements made that Ms. Lee loses her temper."

The trial court correctly determined that the move to Washington was a substantial change in circumstances sufficient to reopen custody. Once custody was re-examined, the trial court found Elizabeth to be less fit as a parent and changed custody to the father. This finding has evidentiary support and is not clearly erroneous. Accordingly, Judge Carlson's custody determination should be affirmed.