959 P.2d 375 (1998)
C.R.B., Appellant/Cross-Appellee,
v.
C.C. and B.C., Appellees/Cross-Appellants.
Nos. S-8104, S-8323.
Supreme Court of Alaska.
May 29, 1998.
*376 Kenneth Kirk, Anchorage, for Appellant/Cross-Appellee.
David A. Golter, Tull & Associates, Palmer, for Appellees/Cross-Appellants.
Before MATTHEWS, C.J., and COMPTON, EASTAUGH and BRYNER, JJ.

OPINION
COMPTON, Justice.

I. INTRODUCTION

Soon after their daughter Catherine's divorce, Carl and Betty Clark[1] took legal custody of Catherine's two sons because of her drug addiction. That was three years ago. Roberto B., the boys' father, now wants custody. He appeals the superior court's denial without a hearing of his motion to modify custody. The court held that his allegations, even if true, do not show a substantial change of circumstances to warrant modification.
This case raises a novel question in an increasingly important realm of family law  custody disputes between parents and nonparents. *377 If a court has properly awarded permanent legal custody to a nonparent after giving a parent notice and an opportunity to be heard, and the parent later moves to modify custody, must the parent make the same threshold showing of a substantial change in circumstances as in a parent-parent case? Because we conclude that the parent must make the same threshold showing, and that the superior court did not err in finding that Roberto had failed to do so, we affirm.

II. FACTS AND PROCEEDINGS

Roberto and Catherine wed in 1988. They had Peter in March 1989 and Brian in February 1991. Catherine has been addicted to cocaine since before the marriage. She and Roberto separated from mid-1990 until late 1991, reunited for six months, and separated finally in April 1992. That is the last time Roberto lived with his sons. He moved from Anchorage to Seattle in July 1992. He and Catherine were divorced in Anchorage in December 1992.
The divorce decree gave Catherine custody of the boys, but in March 1993 a drug-induced crisis led her parents, who live in Palmer, to obtain interim custody and move for permanent custody in the superior court there. The Clarks claimed not to know Roberto's whereabouts; he disputes this. Roberto learned of the Palmer custody proceedings in May 1993. He arranged to visit his sons in July. The Clarks successfully moved the court to require that the visit be supervised; they apparently argued that Roberto, a foreign national, might flee the country with the boys.
In September 1993 Roberto married his current wife Penny. In November 1993 he moved to modify the divorce decree to give him custody. Between November 1993 and January 1994 he and the Clarks engaged in motion practice, primarily concerning whether venue should be in Anchorage or Palmer.
In early 1994 Roberto and Penny opened a restaurant, an endeavor that seems to have taken much of their time and money during the 1993-94 custody proceedings. In February 1994 Roberto withdrew his motion for custody, saying that he had "reached a satisfactory arrangement with the other party and [felt] no particular need to carry this matter forward."
The superior court held a trial on the Clarks' motion for permanent custody in December 1994; Roberto did not appear. The court granted the Clarks sole legal and physical custody of Peter and Brian in a January 1995 order based on substantial findings, mostly about Catherine's unfitness. As for Roberto, the court noted only his withdrawal from the case and failure to appear at trial.
When the Clarks gained permanent custody, Roberto had not seen his sons in eighteen months; he did not do so for fourteen more months, until a March 1996 visit.[2] He moved in May 1996 for a one-month summer visit. The Clarks opposed. The court ordered a one-week visit.
Roberto moved in September 1996 to modify custody. He argued that several changes in his circumstances warranted modification: (1) he had become an American citizen; (2) his marriage and business, both new in 1994, had grown stable and successful; (3) he and Penny had bought a home in a Seattle suburb well-suited for children; and (4) he had begun to rebuild relations with his sons after three nearly incommunicado years. He also suggested that the Clarks had developed health problems, and claimed that they were impeding his relations with his sons. After filing his motion, he learned that Betty Clark had been the subject of a child-in-need-of-aid (CINA) investigation in 1980.
Roberto also sought to explain his withdrawal from the 1993-94 custody proceeding. He claimed that the Clarks had told him that they only wanted temporary custody, and that he had not realized that his custody rights  as opposed to Catherine's  were at risk. His counsel did not disabuse him of these misconceptions, because "[w]hile I did have an attorney at the time, because of my financial situation I did not keep in touch *378 with him." He filed a letter that he had written the court in November 1994 (after he had withdrawn his custody motion, but before the trial). "I still wish to gain custody and my visiting [privileges]," he had written, but "I have not filed for custody again as my budget cannot endure any more lawyer and court fees.... I am not an absent[ee] parent...."
The superior court dismissed Roberto's motion to modify custody in February 1997. It did not hold a hearing. It did grant him visitation, as scheduled in an April 1997 order. Roberto appeals the denial without hearing of his motion to modify custody. The Clarks cross-appeal the visitation order's requirement that they pay half the airfare for Peter and Brian's visits with Roberto.

III. DISCUSSION

A. Standards of Review

This case raises three questions regarding standards of review.[3] We discuss two of them  concerning the court's refusal to order the release of CINA records and its allocation of visitation costs  at the relevant junctures below. See infra p. 383 n. 19 and pp. 384-385. The third concerns our review of a denial without hearing of a motion to modify custody. We will normally overturn a custody determination only if the superior court abused the broad discretion it is granted in such cases or clearly erred in its factual findings. See, e.g., Hayes v. Hayes, 922 P.2d 896, 898 n. 3 (Alaska 1996). In this case, though, the court denied Roberto's motion to modify custody without a hearing. A court may do so if it considers a motion and finds it "plain that the facts alleged in the moving papers, even if established, would not warrant a change [in custody]." Deivert v. Oseira, 628 P.2d 575, 578 (Alaska 1981). We have never addressed the question of what standard of review we should apply to such denials.[4]
Our requirement that the court treat "the facts alleged in the moving papers" as "established" recalls the inquiry on a motion to dismiss for failure to state a claim, in which a court must review only the pleadings and treat all factual allegations as true, and which we review de novo. See, e.g., Christiansen v. Melinda, 857 P.2d 345, 346 n. 2 (Alaska 1993). In Carter v. Brodrick, 816 P.2d 202 (Alaska 1991), though, we applied Deivert and held that a court had wrongly denied a motion to modify visitation without a hearing, but we relied on facts in the movant's "supporting affidavits," indicating that the court should have treated them as true. See id. at 204-05. This suggests, and we now hold, that a court can deny a motion to modify custody or visitation, without holding a hearing, based solely on the pleadings or after considering material beyond the pleadings  e.g., affidavits. The latter step makes its determination like a summary judgment, which we also review de novo. See, e.g., Nielson v. Benton, 903 P.2d 1049, 1052 (Alaska 1995).
We will thus review de novo denials without hearing of motions to modify custody or visitation.[5] We will affirm if, in our independent judgment, the facts alleged, even if proved, cannot warrant modification, or if the allegations are so general or conclusory, and so convincingly refuted by competent evidence, as to create no genuine issue of material fact requiring a hearing. See Acevedo v. Burley, 944 P.2d 473, 475 (Alaska 1997) (reviewing denial without hearing of motion to *379 modify child support) (citing Epperson v. Epperson, 835 P.2d 451, 453 & n. 4 (Alaska 1992)).

B. A Parent Who Moves to Modify a Nonparent's Properly Granted, Permanent Custody Must Show as Substantial a Change in Circumstances as in a Parent-Parent Case.

Two foundational policies in child custody law collide in this case: the law's preference for parental over nonparental custody, and the law's desire to meet children's needs for stability by requiring a substantial change in circumstances before modifying custody. In a typical (parent-parent) case, a parent who seeks a hearing on a motion to modify custody must allege facts that, if proved, would establish a substantial change in circumstances. See AS 25.20.110; Garding v. Garding, 767 P.2d 183, 184-85 (Alaska 1989); Deivert, 628 P.2d at 577-78.
Roberto concedes that he must show a "substantial change in circumstances," but argues that he need not show as substantial a change as a parent seeking to modify another parent's custody.[6] He stresses the policy favoring parental custody: in an initial custody determination, a parent is entitled to custody over a nonparent unless the latter proves that the parent is unfit, or that their custody would be "clearly detrimental to the child." Carter v. Novotny, 779 P.2d 1195, 1197 (Alaska 1989) (citing Britt v. Britt, 567 P.2d 308, 310 (Alaska 1977) and Turner v. Pannick, 540 P.2d 1051, 1055 (Alaska 1975)).
Roberto supports his claim by noting that a parent can show a less substantial change to modify visitation. See Hermosillo v. Hermosillo, 797 P.2d 1206, 1209 (Alaska 1990). A change in visitation, though, is much less significant to a child than a change in custody. Our lower standard in visitation cases merely shows that we have different standards for different types of modifications; Roberto offers no reason to view a change in permanent custody like a change in visitation.
He also argues that a parent in his position deserves the same right to a hearing as a parent who has lost custody in a CINA case but claims to be rehabilitated. See Rita T. v. State, 623 P.2d 344, 346-47 (Alaska 1981). The Clarks reply that CINA cases under Title 47 and custody cases under Title 25 are different procedures, and that while the CINA statute stresses family preservation, Title 25 focuses on meeting children's needs by permanently placing them in stable homes.
The Clarks' argument is more persuasive. In the CINA case Roberto cites, we noted that, once a child moves from State custody to permanent adoptive placement, a parent's right to a rehabilitation hearing ends. See Rita T., 623 P.2d at 347 & n. 5 (citing AS 20.15.130(a)). While CINA laws do prioritize reunification, see id. at 346-47, they also direct the State to permanently place children whose parents' rights are terminated, reflecting "a legislative intent that permanent homes be found for the children so that [they can have] a stable family life." Id. at 347 (citing AS 47.10.080(c)(3)). While the Clarks have not adopted Peter and Brian, and the State has not terminated Roberto's parental rights, the same policy goals of stability and permanence argue against automatically granting him a hearing.
Beyond his CINA analogy, Roberto relies on the parental preference doctrine, which we have hitherto applied only to initial custody determinations.[7]See, e.g., Turner, 540 *380 P.2d at 1055; Carter, 779 P.2d at 1197. We apply a parental preference to avoid "the danger of giving courts the power to award custody ... to [nonparents] solely on the grounds of best interests. If [that] is the only criterion, then a judge may take children from their parents because the judge personally [disapproves of] the parents' limited means." Turner, 540 P.2d at 1055; see also id. at 1054-55 (citing chilling example of Painter v. Bannister, 258 Iowa 1390, 140 N.W.2d 152, 154 (1966) (indicating disapproval of father's bohemian lifestyle, despite evidence of his care and concern for child, and giving grandparents custody on ground that their home provided "a stable, conventional, middle-class, middlewest background")). Justice Dimond noted in Turner that to let a court take a child from its parents merely because a nonparent can better serve the court's idea of the child's interests is "a step toward a totalitarian government." Id. at 1055-56 (Dimond, J., concurring).
The parental preference avoids this danger by requiring a nonparent not merely to prove by a preponderance of the evidence that the nonparent can better serve a child's interests, but to prove by "clear evidence" that a parent is unfit or that his or her custody is clearly detrimental. Carter, 779 P.2d at 1197. We apply this rule, like most courts, despite an inevitable sacrifice of children's interests in cases where a nonparent can better serve those interests, but a parent's custody is not "clearly detrimental."[8]
Such sacrifice is unnecessary where a court has granted a nonparent custody after giving a parent notice and a chance to be heard (and after applying Turner if the parent contested custody). If such a parent later moves to modify custody, requiring that parent to show a substantial change in circumstances does not skirt the slope that leads to totalitarian social engineering. A parental preference is a vital safeguard against enabling nonparents to convince courts to remove children improperly from their parents. Once a court has properly transferred custody from a parent to a nonparent, it does no good to apply the doctrine to weaken the substantial change requirement for modification. The proceeding that gave the nonparent custody will have enabled the parent to exercise the parental preference, and achieved the goal that leads us to treat parent-nonparent cases differently from other custody cases. Having once protected the parent's right to custody, at the risk of sacrificing the child's best interests, we should not then sacrifice the child's need for stability in its care and living arrangements by modifying those arrangements more readily than in a parent-parent case.
Our review of out-of-state cases[9] suggests that the modern rule is to impose the same changed-circumstances requirements on parents who seek to modify a nonparent's court-ordered, permanent custody as on parents who seek to modify parental custody.[10] A *381 recent treatise suggests that this is a majority rule,[11] although it is not universal. Compare, e.g., Shortt v. Lasswell, 765 S.W.2d 387 (Mo. App. 1989).
We thus hold, as a general rule,[12] that a parent moving to modify a nonparent's court-ordered, permanent custody must show no less substantial a change in circumstances than a parent in a typical case.

C. Roberto's Factual Allegations, Even if Proved, Cannot Constitute a Substantial Change in Circumstances.

When a parent moves to modify custody, the court must "consider" the motion,[13] but need not hold a hearing "if it is plain that the facts alleged in the moving papers, even if established, would not warrant a change." Deivert, 628 P.2d at 578. The moving parent must show changes that affect the child's welfare, see S.N.E. v. R.L.B., 699 P.2d 875, 878 & n. 3 (Alaska 1985); reflect more than mere passage of time, see Nichols v. Nichols, 516 P.2d 732, 734 n. 3 (Alaska 1973); and overcome our deep reluctance to shuttle children back and forth between parents. See Gratrix v. Gratrix, 652 P.2d 76, 80 (Alaska 1982) (citing Nichols, 516 P.2d at 735).[14] That reluctance reflects our "assumption that finality and certainty in custody matters are critical to the child's emotional welfare." Id. at 82-83; see also Buness v. Gillen, 781 P.2d 985, 989 & n. 8 (Alaska 1989) (stressing gravity of harm in parent-nonparent case if court severed child's strong emotional bond with "psychological parent").
The parties have dissected Roberto's alleged changes. Predictably, the Clarks dismiss the changes seriatim, while Roberto argues that the court failed to view them as a whole. He is right that a court must not analyze a series of parts one by one and conclude that none satisfies a test meant to address the whole. But in this case, the court did not do so. It rightly found that many of his alleged changes are of no weight at all, and that the sum of the rest falls short of being so substantial as to warrant removing Peter and Brian from their home.
*382 We first note changes of no weight. Roberto's new citizenship is irrelevant, as it does not affect the children.[15]
The Clarks' "medical problems" are illusory. Roberto affied that it was his "understanding that [the Clarks] are having medical problems," and they counter-affied that Betty had suffered cancer that is in remission and that Carl is well. Roberto argues that the lack of a hearing kept him from developing this "issue."
A party seeking a hearing on a motion to modify cannot rest on a generalized allegation if "other record evidence convincingly refutes" it. Acevedo, 944 P.2d at 475. Movants must indicate that they can produce admissible evidence of specific facts rebutting that evidence. See, e.g., Howarth v. First Nat'l Bank of Anchorage, 540 P.2d 486, 489-90 (1975); see also Alaska R. Civ. P. 56(e) ("[A]ffidavits shall be made on personal knowledge...."); Broderick v. King's Way Assembly of God, 808 P.2d 1211, 1218 (Alaska 1991) ("[I]nadmissible hearsay assertions in an affidavit cannot be used ... to oppose ... summary judgment."). The Clarks' affidavits refuted Roberto's vague hearsay claim. He alleged no specific facts in reply that would make their health a salient issue. The court was right to disregard the issue.
Roberto alleges that the Clarks have interfered with his relationship with his sons. But as the court noted, the alleged "interference" mainly comprises objections to Roberto's visitation motions that the Clarks had a legal right to make. Roberto notes his "inability to obtain reasonable visitation through negotiation with the [Clarks]," which prompted this litigation. Given his original withdrawal from the case, though, the court did not premise the Clarks' custody on an assumption that they and Roberto would informally arrange a mutually satisfactory visitation schedule. Compare Siekawitch v. Siekawitch, 956 P.2d 447 (Alaska 1998) (finding change in circumstances where parties' express prediction in dissolution petition that they could "amicably decide in the future on reasonable visitation times" proved incorrect). Roberto accuses the Clarks of "not attempting to encourage the relationship," but the custody award did not presume that they would.
The Clarks, perhaps implicitly admitting some antipathy, cogently deny any change in their attitude or behavior. Reading the entire record in the light most favorable to Roberto, one can infer some antipathy on their part to his new paternal involvement. Such antipathy, if proved, would be a factor in a best-interests inquiry. See AS 25.24.150(c)(6). But merely noting that unchanged antipathy, which has not led them to undermine any assumption of the original custody award, cannot help Roberto show a substantial change in circumstances and thus require the court to conduct a best-interests inquiry. The court sensibly accommodated the new circumstance of his desire to be a parent by ordering visitation.[16]
The remaining changes are Roberto's purchase of a home and resumed contact with his sons, the stabilization of his new marriage and business, and the discovery that Betty Clark had undergone a CINA investigation.[17]
*383 The first two are good steps towards readiness for custody but not sufficient to warrant a change. As for the third, Roberto argues that the court erred when it completely discounted his new marriage and business on the ground that those changes had already occurred by the time of the custody trial. He argues that those developments were new and uncertain then but are stable now. That is a plausible way to characterize the facts.[18] We have said that, while "[m]ere passage of time ... is not of itself a change in circumstances sufficient to support modification" of custody, "[t]he passage of time as it affects the relationships of parties may bear relevance to a change of custody." Nichols v. Nichols, 516 P.2d at 734 n. 3.
Roberto's new marriage and business both do predate the custody decision. That decision, moreover, did not rest in any way on a concern that either change was unstable in its novelty. Their maturation, then, is relevant, but not controlling. The sum of that maturation, Roberto's purchase of a new home, and his resumed contact with his sons falls short of the sort of comprehensive lifestyle change that warranted modification in Nichols v. Mandelin, 790 P.2d 1367 (Alaska 1990). In Mandelin, which established that unilateral improvements can constitute a substantial change, the mother had remarried and become employed since the original decision and, unlike Roberto, she was an alcoholic, but had finally learned to manage her illness. See id. at 1372 & nn. 12-15.
Beyond the above unilateral changes, Roberto argues that the denial of his motion for access to records of the 1980 CINA investigation kept him from developing that issue, which concerns the Clarks' fitness. They concede that the State investigated Betty and that abuse was alleged; their counsel alluded to the court's "aware[ness] of [Catherine]'s claims that she was mistreated by her mother."
The CINA statute and rules make CINA records confidential, but authorize courts to "order their use for good cause shown." AS 47.10.090(c); see CINA Rule 22 (similar).[19] The 1980 CINA case was remote in time when Roberto made his motion, and he has not alleged any current abuse or neglect, any pattern of abuse, or, indeed, any abuse after 1980. The 1980 case thus seems a closed episode with no likely connection to the question of Peter and Brian's present custody. While it might have been more prudent to inspect the records in camera than to dismiss Roberto's motion outright, we cannot say that the court abused its discretion in taking the latter course.
It follows that Roberto's allegations about the 1980 case are too speculative to contribute significantly to showing a substantial change of circumstances today. While any suggestion of past child abuse may be *384 disturbing, Roberto has not specifically, affirmatively alleged that any serious abuse did occur in 1980, and there is not even a hint that any such hypothetical abuse has recurred with Peter and Brian. The bare fact that the State initiated a CINA investigation eighteen years ago is of very slight weight in determining Peter and Brian's custody today.
We conclude that the CINA investigation, the deepened stability of Roberto's new marriage and business, his new home, and his resumed contact with his sons do not constitute a substantial change in circumstances warranting a hearing on modification.[20]

D. The Court Did Not Abuse Its Discretion in Ordering the Clarks to Pay Half the Airfare for the Boys to Visit Roberto.

In its order denying Roberto's motion to modify custody, the court "encourage[d][his] interest in becoming a more active parent, and recognize[d] that it also is very important for the children to have a strong bond with their natural father." It ordered twice-yearly visits, required an escort for the boys' flights to Seattle in 1997-98, and ordered the Clarks to pay half of the children's and escort's airfare. The Clarks moved the court to reconsider the last provision. The court declined, noting the absence of authority on the issue and finding, "in balancing the equities of the situation, [that] this cost is properly shared" by the Clarks and Roberto. The court also found that having the Clarks share the cost will make the visits more likely to occur, since two visits per year "might be prohibitively expensive" for Roberto alone.[21]
The Clarks cross-appeal. They argue that, while a parent has a general duty to support its child and can be charged with a specific duty to pay travel costs for visits with a noncustodial parent, grandparents have no duty to support their grandchildren and, absent specific authority, a court cannot order them to pay travel costs.
Civil Rule 90.3(g) authorizes a court that has awarded child support to "allocate reasonable travel expenses ... necessary to exercise visitation between the parties as may be just and proper for them to contribute." Roberto and the Clarks are parties to a child support award, so the rule gave the court discretion to allocate expenses between them under a broad "as may be just and proper" standard.
We have never set a standard for reviewing such allocations, but have suggested that we would review for abuse of discretion[22] and  absent a persuasive argument to the contrary[23]  will do so now.
While grandparents generally have no duty to support their grandchildren, the court was right to note that the Clarks are atypical grandparents. It is odd for them to argue "as grandparents" that they have no duty to support Peter and Brian; the court ordered them to pay not in their generic capacity as grandparents, but in their specific role as the boys' permanent legal custodians  a role that they fought in this proceeding to retain. They argue that they "have voluntarily undertaken to provide for the children," and that it is inequitable to "forc[e] them to also shoulder expenses of [Roberto]'s visits with" the boys. But they have not just voluntarily undertaken to provide for whichever *385 of the boys' needs they choose; they have obtained legal custody of Peter and Brian and must provide for all of their needs.[24] In accord with the public policy favoring visitation with noncustodial parents,[25] the court found it among the children's needs "to have a strong bond with their natural father." The court did not abuse its discretion in requiring the Clarks, as Peter and Brian's legal custodians, to pay half the costs of meeting that need.[26]

IV. CONCLUSION

In Roberto's appeal, S-8104, we AFFIRM the denial without a hearing of his motion to modify custody. In the Clarks' cross-appeal, S-8323, we AFFIRM that part of the visitation order that requires them to pay half the cost of flying Peter and Brian to Seattle to visit their father.
FABE, J., not participating.
NOTES
[1] We use pseudonyms throughout this opinion.
[2] Carl Clark said this in an affidavit; the Clarks' brief reiterates it; and Roberto has not disputed it.
[3] The question of what changed-circumstances standard applies to a motion to modify nonparental custody is of course a question of law that we decide de novo, adopting the most persuasive rule of law in light of precedent, policy, and reason. See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).
[4] We have reviewed denials without hearing of motions to modify custody or visitation for abuse of discretion without discussing why we did so. See Acevedo v. Liberty, 956 P.2d 455 (Alaska 1998); Nelson v. Jones, 944 P.2d 476, 478 (Alaska 1997); Carter v. Brodrick, 816 P.2d 202, 205 (Alaska 1991); Deivert v. Oseira, 628 P.2d 575, 577-78 (Alaska 1981).
[5] This parallels the approach that we announced last year for denials without hearing of motions to modify child support. See Acevedo v. Burley, 944 P.2d 473, 476 n. 2 (Alaska 1997) ("For purposes of determining the standard of review ... we draw analogy to review of summary judgment decisions.... [W]e review the ... decision using our independent judgment.").
[6] In 1982 the legislature amended the custody law to expressly require a "change in circumstances" to modify custody, codifying this court's rule. See Garding v. Garding, 767 P.2d 183, 185 (Alaska 1989) (discussing AS 25.20.110). Both before and since the codification, we have in fact required a "substantial change in circumstances." See, e.g., id. (discussing cases before and after codification and requiring "substantial change," though AS 25.20.110 does not say "substantial") (emphasis added).
[7] Roberto also argues that, once he shows a substantial change in circumstances, he need not bear the further burden of showing that modification will best serve Peter and Brian's interests, as he would in a parent-parent case. See AS 25.20.110; Garding, 767 P.2d at 184-85. If he shows a substantial change, he argues, then the court must give him custody unless it finds that to do so would be "clearly detrimental" to the children, as in an initial custody dispute involving a nonparent. See Turner v. Pannick, 540 P.2d 1051, 1055 (Alaska 1975). (Presumably, the Clarks would bear the burden of showing clear detriment. See id.) Because we conclude that he has not shown a substantial change, we need not decide whether to apply Turner, or the usual best-interests standard, in a parent-nonparent case in which a parent does surmount the substantial-change threshold.
[8] See generally Adrienne E. Volenik (Maris Warfman, 1996 update), "Disputes Between Parents and Third Parties," in 2 Child Custody & Visitation Law and Practice §§ 11.01 & 11.03, at 11-3 to -4 & 11-6 to -7 (John P. McCahey et al. eds., 1997).
[9] The parties cite no out-of-state case or treatise, though they agree that this issue is one of first impression in Alaska, and though other states have resolved it. While a focus on Alaskan cases is appropriate, and while a state-by-state survey is not necessary or advisable, it does help us frame our inquiry in a case of first impression if the parties at least note leading cases or treatises and the trend in other states regarding the novel issue.
[10] See, e.g., Ex Parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984); Jones v. Strauser, 266 Ark. 441, 585 S.W.2d 931, 932 (1979); Bivens v. Cottle, 120 N.C. App. 467, 462 S.E.2d 829, 830-31 (1995); In re Whiting, 70 Ohio App.3d 183, 590 N.E.2d 859, 861-62 (1990); Johnson v. Johnson, 681 P.2d 78, 80-81 (Okla. 1984); Lear v. Lear, 124 Or. App. 524, 863 P.2d 482, 484 (1993); Taylor v. Meek, 154 Tex. 305, 276 S.W.2d 787, 789-90 (1955) (reaffirmed after amendment of custody statute in In re Ferguson, 927 S.W.2d 766, 768-69 (Tex. App. 1996)); Dyer v. Howell, 212 Va. 453, 184 S.E.2d 789, 792 (1971); see generally Carol Crocca, Annotation, Continuity of Residence as Factor in Contest Between Parent and Nonparent For Custody of Child Who Has Been Residing With Nonparent  Modern Status, 15 A.L.R. 5th 692, 807-14 (1993) (collecting cases "in which parents were required to prove a material change in circumstances and/or that modification of custody would materially promote the welfare of the children").
[11] See Volenik (Warfman, 1996 update), supra note 8, § 11.03[2][b], at 11-10 to -11.
[12] We do not hereby disfavor the practice of vesting custody temporarily in a nonparent until a parent can get his or her life sufficiently together to resume custody. See, e.g., Britt v. Britt, 567 P.2d 308, 309-10 (Alaska 1977); Bass v. Bass, 437 P.2d 324, 326-27 (Alaska 1968) (specifically approving practice). Courts should make clear whether a grant of nonparental custody is temporary or permanent, and ensure that they carefully warn a parent that a hearing may have the latter result. Parents can regain custody in a temporary-custody case without showing a substantial change in circumstances, and can rely on the Turner preference. See Britt, 567 P.2d at 310.

We also do not decide when, if ever, a parent who has informally agreed to or acquiesced in nonparental custody, without a court order, must show a substantial change to regain custody. Cf. Turner, 540 P.2d at 1052, 1055 (noting but not resolving dispute over whether agreement to let nonparent care for child was temporary or permanent, applying standard for initial custody contest, and not requiring substantial change).
Britt, Bass, and Turner differ critically from this case: none involved an order giving a nonparent permanent legal custody. The court here did not explicitly or implicitly treat the Clarks' custody as a temporary step until Roberto could resume custody.
[13] The trial judge's long, thoughtful orders leave no doubt that she considered all of Roberto's arguments.
[14] The parties dispute whether a parent can surmount the "substantial change" threshold by showing unilateral improvement in his or her own situation. In 1989 we said that a parent cannot: "`mere improvement in the position of one of the parties is not sufficient to justify a change in custody.'" Garding, 767 P.2d at 186 (quoting Gratrix v. Gratrix, 652 P.2d 76, 83 (Alaska 1982) and citing Nichols v. Nichols, 516 P.2d 732 (Alaska 1973)). But we have since made clear that the rule is not per se. See Nichols v. Mandelin, 790 P.2d 1367, 1372 & n. 15 (Alaska 1990) (distinguishing Garding and Gratrix and saying that those opinions do not "preclude a trial court from finding that significant long[-]term changes in a party's lifestyle could constitute a substantial change in circumstances").

Roberto's allegations cannot show a substantial change even if we view unilateral improvements no differently than changes in a custodian's circumstances. We thus need not decide to what degree, if any, we still disfavor reliance on unilateral improvement to show a substantial change in circumstances.
[15] The record only shows the citizenship issue having arisen in 1993, when Roberto, then a foreign national, visited his sons, and the Clarks insisted that the visit be supervised. They apparently argued that he might flee the country with the boys. His new citizenship could thus be relevant to a motion to allow unsupervised visitation, but the court's order already grants that. Roberto has not explained how his new citizenship is relevant to custody.
[16] By denying a custody hearing and scheduling visitation, the court implicitly premised the Clarks' continued custody on their noninterference with the scheduled visitation. If they do materially interfere, that may well constitute a substantial change in the circumstances surrounding the orders that now govern custody; an assumption that the Clarks will respect the letter and spirit of the visitation order is now one of those circumstances.
[17] The Clarks argue that a 1980 CINA case cannot constitute a "change in circumstances" since a 1994 trial, but it would be deplorably formalistic to ignore new evidence of dire unfitness merely because the evidence happened to exist  unknown to the court  at the time of trial. The majority view is that a court can modify custody "if the child's welfare requires it, not only for changes in circumstances occurring after the initial decree, but also on the ground of facts existing at the time of that decree [but] ... not presented to or known by the court [that] issued that decree." 2 Homer H. Clark, Jr., The Law of Domestic Relations in the United States: Practitioner's Ed. § 20.9, at 551 & n. 33 (2d ed. 1987). Professor Clark doubts that even courts who only consider changes that occur after an order would refuse to look at "events occurring before ... if [they] tended to show a probability of serious physical or emotional harm to the child." Id. at 550-51 & n. 30 (citing Valencia v. Valencia, 71 Ill.2d 220, 16 Ill.Dec. 467, 375 N.E.2d 98 (1978), where court, in giving mother custody, had been unaware that man living with her had history of child abuse).
[18] Since our review is analogous to our review of a summary judgment, see supra at 378-379, we note that Roberto's characterization of the facts probably falls within the rule that a court considering a summary judgment "must view the facts in the light most favorable to the nonmoving party." Mathis v. Sauser, 942 P.2d 1117, 1120 (Alaska 1997).
[19] We have not set a standard of review for decisions on whether to disclose CINA records, but we have referred to the decision as discretionary. See Matter of A.B., 791 P.2d 615, 620 n. 7 (Alaska 1990) ("[C]ourts have discretion to order records disclosed in a [CINA] proceeding."). As with other discovery orders made under "good cause" standards, we will review decisions about releasing CINA records for abuse of discretion. See Novak v. Orca Oil Co., 875 P.2d 756, 761-63 (Alaska 1994) (reviewing for abuse of discretion an order granting access to investigative files that statute made confidential "unless otherwise ordered ... for good cause shown"); Dingeman v. Dingeman, 865 P.2d 94, 99 (Alaska 1993) (same for finding of "good cause" to order medical examination under Civil Rule 35). See also Cockerham v. State, 933 P.2d 537, 539 n. 9 (Alaska 1997) ("[W]e generally review rulings on discovery for an abuse of discretion.") (citing Gunnerud v. State, 611 P.2d 69, 72-73 (Alaska 1980)).
[20] We note that nothing bars Roberto from again moving for custody based on a future change in circumstances that is substantial.
[21] The Clarks do not challenge this factual finding.
[22] See Nass v. Seaton, 904 P.2d 412, 419 (Alaska 1995) (noting court's "discretion to allocate travel expenses among the parties"; posing issue of whether court "abused its discretion in allocating visitation[-]related expenses"; but declining to resolve issue, given decision to remand on other grounds); cf. Gallant v. Gallant, 882 P.2d 1252, 1257 (Alaska 1994) (reviewing for abuse of discretion a creative calculation of child support in a case involving nonparental custody).
[23] The Clarks argue that whether a court can order grandparents to support a grandchild is a legal question that we must review de novo. This is true in general, but is not relevant here, as we treat the court as having ordered them to pay travel costs not as grandparents, but as parties to a child support order, who are subject under Civil Rule 90.3(g) to the court's authority to divide travel costs between them and the other party to the order "as may be just and proper."
[24] See, e.g., 1 Clark, supra note 17, § 7.2, at 443 (noting that one owes common-law duty of support if one takes child into family and acts in loco parentis); cf. 2 Jeff Atkinson, Modern Child Custody Practice § 10.32, at 536 (1986) (discussing cases equitably obliging stepparents to support children and noting that, if stepparent obtains legal custody, "presumably the grant of custody carries with it a duty to support").

A divided Alabama Supreme Court held that even after a grandfather stopped acting in loco parentis to his grandchild  by divorcing the grandmother, who retained custody  he still had "a legal duty to support [the child] that ar[ose] from the legal custody of the child that he [had] sought and obtained in the juvenile court." Ex parte Lipscomb, 660 So.2d 986, 988-89 (Ala. 1994). It would be strange if a child's permanent legal custodian(s) did not have such a duty, at least while they retained custody; otherwise a grant of custody to a nonparent would leave a child with no one in its home legally obliged to support it. Cf. Gowland v. Martin, 21 Ariz. App. 495, 520 P.2d 1172, 1175 (1974) (affirming grant of custody to maternal grandparents  rather than to teenaged father, whose parents planned to help him raise the child  because granting the father custody would not legally oblige his parents to support the child, while giving the maternal grandparents custody did "place[] a legal obligation upon [them] to support and raise the child," and court preferred to rely on legal duty to ensure ongoing support).
[25] See Ch. 88, § 1, SLA 1982 (stating legislative finding in enacting AS 25.20.060, which governs visitation, "that it is generally desirable to assure a minor child frequent and continuing contact with both parents after [divorce]").
[26] The court also stated, and the Clarks vigorously protest, an alternate rationale that its order will "facilitat[e] [Catherine's] indirect financial support of visitation" because "[t]he court intends that some of the child support collected by the [Clarks] from [Catherine] ... offset the travel costs." Given the adequacy of the rationale set forth above, we need not address the validity of this alternate rationale or of the implicit factual findings supporting it.