NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DAN A.,        )<br><br>    Appellant and )<br>    Cross-Appellee, )<br><br>       )<br>v.       )<br>       )<br>STATE OF ALASKA,   )<br>DEPARTMENT OF HEALTH & )<br>HUMAN SERVICES, OFFICE OF )<br>CHILDREN'S SERVICES,  )<br>       )<br>    Appellee and )<br>    Cross-Appellant. )<br>       ) | Supreme Court Nos. S-13849/13859/ 14249 (Consolidated)<br><br>Superior Court No. 3KN-06-00110 CP<br><br>MEMORANDUM  OP I N I O N AND JUDGMENT*<br><br>No. 1404 - January 13, 2012 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna M. Moran, Judge.

Appearances: G. Blair McCune, Wasilla, for Appellant. Michael G. Hotchkin, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian Ad Litem.

Before: Carpeneti, Chief Justice, Fabe, Winfree, Christen, and Stowers, Justices.

## I.     INTRODUCTION

A father appeals the termination of his parental rights to his son, arguing

---

\*      Entered pursuant to Appellate Rule 214.

the superior court misapplied a Child in Need of Aid (CINA) statute and clearly erred in finding he had abandoned his son. The State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) cross-appeals, arguing the superior court misinterpreted a different provision of the CINA statute and clearly erred in failing to find the father caused mental injury to his son. Because the court correctly applied the law and the evidence supports the court's abandonment finding, we affirm the termination of parental rights without reaching OCS's cross-appeal.

The father also appeals the superior court's denial of his Alaska Civil Rule 60(b) motion to set aside the parental rights termination, arguing ineffective assistance of counsel and erroneous denial of in camera review of certain records. He argues his trial counsel failed to call a witness and had a conflict of interest and that confidential records from an unrelated CINA proceeding, which the superior court refused to review in camera, might have confirmed the conflict of interest. Because the superior court did not abuse its discretion, we affirm its denial of in camera review of the CINA records; because the father did not rebut the presumption of trial counsel's competence or demonstrate an actual conflict and there was no resulting prejudice, we affirm the superior court's denial of the Rule 60(b) motion.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Background

Toby was born in January 2001 to Dan and Angela.[1] Toby lived with Dan, Angela, and two half-siblings until he was seven months old. Dan and Angela's relationship then ended; Toby stayed with Dan and they moved in with Dan's parents.

---

[1] We use pseudonyms for all family members. Toby is not an Indian child under 25 U.S.C. § 1903. Angela relinquished her parental rights to Toby and is not a party to this appeal.

Dan worked several different seasonal occupations in remote locations: as a wildland firefighter, a mechanic on the North Slope, and a fisherman out of Kodiak. During most of these absences, Toby was cared for by Dan's parents, Hugh and Sophie.

### 2. Informal OCS involvement

OCS received unsubstantiated reports that Dan was neglecting Toby in January 2002, April 2003, and June 2003. OCS placed Toby in foster care for 24 hours in June 2003 while Dan was in jail; a CINA petition was not filed because Dan made appropriate arrangements for Toby's care.

In December 2005 OCS took emergency custody of Toby's cousins, who were living with Hugh and Sophie. Dan and Toby were present at the time, but OCS was primarily concerned with Toby's cousins. OCS claimed it warned Dan that if he left Toby with Hugh and Sophie in the future, OCS would file a CINA petition for Toby. Dan disputed that OCS warned him not to leave Toby with Hugh and Sophie, but he made arrangements for Toby to stay with Gwen, a family friend, in the event OCS became re-involved.

### 3. First OCS involvement

In July 2006 OCS received an unsubstantiated report that Hugh and Sophie were caring for Toby. In mid-November 2006 OCS received another report that Hugh and Sophie were caring for Toby and substantiated that report with a home visit. Even though the home was "filthy" and there was evidence of drug and alcohol abuse, OCS did not immediately remove Toby. OCS contacted Dan by telephone and he indicated he was in Kodiak. Dan was hesitant to resume Toby's care and asked OCS about temporary placement with Gwen or a foster home. Dan and OCS worked out a safety plan with Gwen caring for Toby temporarily and OCS assisting Dan and Toby with obtaining services, including parenting classes and special education. OCS placed Toby with Gwen later that month. About the same time, Dan moved to Anchorage to prepare

for work on the North Slope.

Within a month Gwen informed Dan that she was unable to continue caring for Toby. Because Dan was preparing to leave for the North Slope, he refused to take Toby back. OCS learned of the situation. Dan refused to tell OCS his location, but said he was unable to care for Toby and suggested placing Toby in foster care. OCS filed an emergency CINA petition and placed Toby with a foster parent. Dan attended a December 20, 2006 emergency custody hearing by telephone from Wildwood Correctional Facility[2] and left for work on the North Slope on January 17, 2007.

In January 2007 Angela contacted OCS, and a week later OCS placed Toby with Angela. Dan did not attend hearings in February or April 2007 and at the April hearing his attorney indicated she had not heard from him since December 2006. On April 11, 2007, the case was dismissed because Toby had been placed in Angela's care.

Angela testified Dan never contacted her or spoke to Toby when Toby was in her care from January to July 2007. Dan testified he knew Toby was with Angela and he had tried to contact Angela and OCS without success.

**4.    Second OCS involvement**

In July 2007 OCS received an unsubstantiated report that Angela was smoking crack cocaine and leaving Toby with inappropriate care givers. OCS did not take Toby into custody at that time, but did so later in July when Angela left Toby with a different care giver, did not return, and could not be located. Angela stipulated to temporary OCS custody and to Toby's status as a child in need of aid under AS 47.10.011(1) and (8) in November 2007.[3]

---

[2]    The record does not indicate why Dan was incarcerated at this time but does indicate a pattern of brief incarcerations.

[3]    In relevant part, AS 47.10.011 provides:

(continued...)

The summons for the second CINA petition was not served on Dan. OCS and Toby's guardian ad litem (GAL) were both initially unsuccessful in contacting Dan, despite numerous efforts. Dan and OCS finally reconnected in early 2008. Seven months earlier OCS had developed a case plan that required Dan to, among other things, obtain a substance abuse evaluation, perform weekly drug testing, complete a psychological assessment, visit with Toby, and meet monthly with OCS. Dan failed to participate in his case plan in any manner and did not participate in any court hearings. Dan had some telephone contact with Toby in the spring of 2008; but the superior court found that from December 2006 when OCS took custody of Toby until early 2008, Dan had "made no attempts whatsoever to locate [Toby], to find out where he was living, who he was living with, or how he was doing."

After March 2008 OCS had no contact with Dan until summer. Dan was unwilling to participate in, or even sign, a case plan. Dan finally agreed to undergo drug

---

[3] (...continued)
[T]he court may find a child to be a child in need of aid if it finds . . . :

(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;

. . . .

(8) conduct by or conditions created by the parent, guardian, or custodian have

(A) resulted in mental injury to the child; or

(B) placed the child at substantial risk of mental injury as a result of [specified acts.]

testing in September 2008, but never actually submitted to testing, citing validity concerns. Dan also missed a permanency planning conference that OCS advised him to attend. OCS workers had a conversation with Dan in October 2008, but had no further contact with him until February 2009. Dan again refused to sign or participate in a case plan.

Dan appeared at a pretrial conference on the petition to terminate his parental rights in June 2009, the first court proceeding he had appeared at since the December 2006 emergency custody hearing. Dan began telephone visits with Toby in June 2009, but Dan's visitation participation was erratic — the visits were suspended in July 2009 and eventually cancelled in November 2009. Dan had been advised that visitation consistency was extremely important to Toby's mental condition because the lack of consistency compounded Toby's anxiety issues. Dan was also encouraged to write letters to Toby, but he never did.

In July 2009 Dan signed a case plan. As required by the case plan, he completed a substance abuse assessment in October 2009 and completed a parenting class. His case plan also required regular drug tests, many of which he missed, and substance abuse treatment, which he never began.

At the termination trial Dan testified he had not seen Toby in person since Toby was at Gwen's house — three years earlier. The superior court found Dan had not sent any cards, letters, or presents to Toby and had only sporadic phone visits with Toby and sporadic contact with OCS since December 2006.

## B. Proceedings

The superior court held a seven-day termination trial in October 2009 and

*1404*

January 2010. At the conclusion of the trial, the court terminated Dan's parental rights.[4] It found Toby was a child in need of aid under AS 47.10.011(1) because Dan had abandoned Toby under AS 47.10.013(a)(2), (3), (4), and (7).[5] The court did not find that

---

[4]     Under relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that:

(a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A));

(b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) – (ii)); and

(c) reasonable efforts have been made to provide family support services designed to prevent the breakup of the family (CINA Rule 18(c)(2)(A)); and

(2) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)).

[5]     In relevant part, AS 47.10.013(a) provides:

Abandonment of a child also includes instances when the parent or guardian, without justifiable cause,

. . . .

(2) has made only minimal efforts to support and communicate with the child;

(3) failed for a period of at least six months to maintain regular visitation with the child;

(4) failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child;

. . . .

(7) failed to respond to notice of child protective

(continued...)

Dan had caused Toby mental injury under AS 47.10.011(8), as OCS argued. Dan appealed the finding of abandonment; OCS cross-appealed the failure to find mental injury. No other termination findings were appealed.

Dan subsequently filed a motion for relief from judgment under Rule 60(b), primarily arguing ineffective assistance of counsel at his termination trial. The superior court denied the motion as beyond its jurisdiction because the case was already on appeal. Upon motion for reconsideration, the superior court requested a remand to address Dan's Rule 60(b) motion. We granted the remand request. After an evidentiary hearing, the superior court denied Dan's Rule 60(b) motion. Dan appealed the denial of that motion.

We consolidated the appeals.

## III. STANDARD OF REVIEW

In a termination of parental rights appeal, we review the superior court's factual findings for clear error and its legal conclusions de novo.[6] Findings are clearly erroneous when, after reviewing the record in the light most favorable to the prevailing party,[7] we are "left with a definite and firm conviction based on the entire record that the trial court has made a mistake."[8] When reviewing factual findings "we ordinarily will

---

[5]    (...continued)
proceedings . . . .

[6]    *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002).

[7]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

[8]    *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 100 (Alaska 2008) (quoting *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002)).

not overturn a trial court's finding based on conflicting evidence,"[9] and we will not re-weigh evidence "when the record provides clear support for the trial court's ruling."[10] Especially in matters involving parental rights termination, we recognize that it "is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[11]

"Whether the superior court's factual findings comport with the requirements of the CINA statutes is a question of law reviewed de novo."[12] "When interpreting CINA statutes and rules, we apply our independent judgment, 'adopting the rule of law that is most persuasive in light of precedent, reason, and policy.' "[13]

"A trial court's ruling on an Alaska Civil Rule 60(b) motion is reviewed for abuse of discretion; it will not be disturbed unless we are left with 'the definite and firm conviction on the whole record that the judge ha[s] made a mistake.' "[14] The right to

---

[9] *Martin N. v. State, Dep't of Health & Soc., Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003) (citing *In re Friedman*, 23 P.3d 620, 625 (Alaska 2001)).

[10] *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000).

[11] *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (quoting *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999)).

[12] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008 (Alaska 2011) (citing *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 6 (Alaska 2003)).

[13] *Danielle A. v. State, Dep't. of Health & Soc. Servs., Office of Children's Servs.*, 215 P.3d 349, 353 (Alaska 2009) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[14] *Williams v. Williams*, 252 P.3d 998, 1004 (Alaska 2011) (quoting *Thomas v. Thomas*, 581 P.2d 678, 679 (Alaska 1978)).

counsel in a CINA case is governed by the due process clause, article I, section 7 of the Alaska Constitution. Whether a parent's due process rights were violated is a question of law we review de novo, while the superior court's underlying factual findings are reviewed for clear error.[15] "As with other discovery orders made under 'good cause' standards, we will review decisions about releasing CINA records for abuse of discretion."[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding Dan Abandoned Toby.

#### 1. Abandonment generally

The basic definition of abandonment is found in AS 47.10.013(a), which provides: "the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult." The statute also provides eight specific examples of conduct that constitute abandonment.[17] "We have articulated a two-part test for reviewing cases of abandonment: (1) there must be parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship."[18] "We apply an objective test 'to see if actions demonstrate a willful

---

[15] *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005).

[16] *C.R.B. v. C.C.*, 959 P.2d 375, 383 n.19 (Alaska 1998).

[17] AS 47.10.013(a)(1)-(8).

[18] *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (internal quotation marks omitted) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)).

disregard of parental responsibility.' "[19]

### 2.  The superior court properly interpreted AS 47.10.011(1).

Dan first argues "the superior court made an error of law in finding Dan abandoned Toby from December 2006 until July 2007 when the second petition was filed." Dan argues AS 47.10.011(1) only allows a child to be adjudicated a child in need of aid if the court finds abandonment under AS 47.10.013 *and* "the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter."[20] He reasons the superior court's decision to place Toby with Angela in January 2007 amounts to "a judicial finding that the other parent, Angela, was present and able to care for Toby." Additionally, he contends no finding or evidence in the record establishes that Angela committed conduct or created conditions that caused Toby to be a child in need of aid.

The proper inquiry is whether both requirements of AS 47.10.011(1) were met at the time of termination, not in July 2007. As discussed below, there was ample evidence before the superior court that Dan had abandoned Toby under AS 47.10.013 prior to the termination trial — satisfying the first part of AS 47.10.011(1). Angela stipulated to Toby's status as a child in need of aid and relinquished her parental rights prior to the termination trial — satisfying the second part of AS 47.10.011(1).

### 3.  The superior court did not err in its factual findings.

Dan argues the superior court made multiple clear errors in its factual findings. He argues the superior court erred in finding Dan did not know where Toby was and made no effort to find him between December 2006 and early 2008. He cites his own testimony at trial that he tried to find Toby. He also claims that he spoke with

---

[19]  *Id.* at 335-36 (quoting *Jeff A.C., Jr.*, 117 P.3d at 704).

[20]  AS 47.10.011(1).

Toby on the telephone between December 2006 and January 2007, March and May 2008, and June and November 2009, and argues this telephone visitation precludes a finding of abandonment. He also argues that his dissatisfaction with Toby's foster care placements and OCS in general justify his lack of cooperation with OCS. He claims that he did participate in his case plan, he just did not successfully complete it. Lastly he argues that because Toby's therapist testified Toby "really loves his dad," the superior court erred in finding destruction of the parent-child relationship.

### a.　　AS 47.10.013(a)(2) & (3)

We have previously stated "[a] parent has an affirmative duty to show continuing interest in the child and to make a genuine effort to maintain communication and association; token efforts to communicate with a child will not satisfy this duty."[21] There is no dispute that Dan had some telephone visitation with Toby — but this visitation was a "token effort" that does not preclude findings under subsections (2) or (3). This sporadic visitation falls well within "minimal efforts" under subsection (2). Additionally, there were gaps in telephone visitation between January 2007 and spring 2008 and again between spring 2008 and summer 2009. Either gap exceeds the six-month requirement of subsection (3). The superior court correctly determined that these two one-year-long periods without visitation, coupled with the absence of any other forms of communication or support, constituted abandonment under AS 47.10.013(a)(2) and (3).

### b.　　Destruction of the parent-child relationship

The record also adequately supports the superior court's finding that Dan's conscious disregard of his parental responsibilities led to the destruction of the parent-

---

[21]　　*In re H.C.*, 956 P.2d 477, 481 (Alaska 1998) (internal quotations and grammatical marks omitted) (quoted in *Jeff A.C., Jr.*, 117 P.3d at 704).

child relationship. Toby's therapist testified that Dan's absence from Toby's life and subsequent inconsistent visitation aggravated Toby's severe anxiety, interfering with his day-to-day functioning. Toby's therapist also testified that Toby's condition had improved since visitation with Dan had ended. Toby's statement that he "really loves his dad" is insufficient to overcome the other evidence in the record under the objective test we apply.[22]

### c. Other issues

Because we uphold the termination based on abandonment under AS 47.10.013(2) and (3), we do not reach either Dan's appeal of the superior court's abandonment findings under subsections (4) and (7) or OCS's cross-appeal.[23]

### B. The Superior Court Did Not Abuse Its Discretion In Denying Dan's Rule 60(b) Motion Based On Ineffective Assistance of Counsel.

Dan raises two ineffective assistance of counsel claims on appeal. First, he argues his trial counsel should have called Hugh as a witness at the termination trial — a decision he argues falls short of an objective standard of reasonableness. Second, he argues his trial counsel had a conflict of interest because she had previously been a GAL for Toby's cousins in two separate and unrelated CINA proceedings.

We granted the superior court's conditional remand request for an evidentiary hearing on Dan's Rule 60(b) ineffective assistance of counsel claims. After holding an evidentiary hearing, the superior court denied Dan's motion. The superior

---

[22] *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009) (upholding finding that "despite the bonds and affection" that existed between the parent and child, there had been a destruction of the parent-child relationship).

[23] *See Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1112 (Alaska 2010) (declining to decide issues of alternative grounds for termination when one ground is dispositive).

court found trial counsel's decision not to call Hugh as a witness was an "appropriate and a sound tactical decision." The court also found Dan failed to show the existence of a conflict or any resulting prejudice from such conflict.

### 1. The general claim of ineffective assistance of counsel

We recently re-affirmed that the two-part test for ineffective assistance of counsel claims in criminal cases, as set out in *Risher v. State*[24] and clarified by *State v. Jones*,[25] applies in CINA cases.[26] "The first prong of the *Risher* test calls for evaluating the standard of the attorney's performance at the termination trial. It asks whether the attorney's performance was at a level that 'no reasonably competent attorney would provide.' "[27] The second prong requires the moving party to show resulting prejudice, or "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[28]

Dan argues his trial counsel's decision not to call Hugh was objectively unreasonable and led to prejudice because Hugh would have testified as to his ability to relay messages to Dan, his and Dan's contacts with OCS, and OCS's haphazard approach to contacting Dan. Dan reasons this testimony would have undercut the OCS case workers' testimony that Dan failed to keep in contact with OCS.

---

[24]    523 P.2d 421(Alaska 1974).

[25]    759 P.2d 558 (Alaska App. 1988).

[26]    *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, __ P.3d __, Op. No. 6628 at 39, 2011 WL 6347722, at *16 (Alaska Dec. 16, 2011) (citing *V.F. v. State*, 666 P.2d 42, 46 (Alaska 1983)).

[27]    *Id.* (quoting *Jones*, 759 P.2d at 568).

[28]    *Jones*, 759 P.2d at 568 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

On the first prong, performance, the court of appeals has noted that "[i]n the absence of evidence ruling out the possibility of a tactical reason to explain counsel's conduct, the presumption of competence remains unrebutted and operates to preclude a finding of ineffective assistance."[29] We have previously found the failure to subpoena witnesses in a CINA case a "strategic decision."[30] As another court noted, "[i]t would be a rare case where counsel's conscious decision not to call a witness would amount to constitutionally ineffective assistance."[31]

On the second prong, prejudice, the court of appeals has identified three considerations when ineffective assistance claims rest on failing to call a potential witness: "the importance of the challenged testimony in relation to the litigation strategies of the parties, the material issues of fact that were disputed at trial, and the other evidence presented on those disputed issues."[32]

Here, Dan's trial counsel's affidavit and testimony established concern over Hugh giving potentially damaging and largely irrelevant testimony, which represent sound tactical reasons. Dan's trial counsel made a conscious decision not to call Hugh, believing his testimony would "do more harm than good." The superior court did not clearly err in finding that trial counsel's "decision not to call [Hugh] was appropriate and a sound tactical decision."

As to prejudice, Hugh's own testimony at the Rule 60(b) evidentiary hearing indicates he was in regular contact with Dan and knew of Toby's placement with Angela as well as OCS custody after the second petition was filed — contradicting Dan's

---

[29]     *Id.* at 569.

[30]     *V.F.*, 666 P.2d at 47.

[31]     *U.S. v. Weaver*, 882 F.2d 1128, 1139 (7th Cir. 1989).

[32]     *Billy v. State*, 5 P.3d 888, 889 (Alaska App. 2000).

trial testimony that he did not know where Toby was. It appears the existence of this testimony would have been *more* prejudicial than its absence. And after hearing the testimony, rather than finding that the result of the proceeding would have been different, the superior court found "it . . . further supported the court's original finding." As such, Dan has not met his burden to show resulting prejudice from the decision not to call Hugh as a witness.

### 2.    Ineffective assistance based on conflict of interest

### a.    Conflict generally

A different test applies where ineffective assistance claims are founded on counsel's conflict of interest.[33] Where the conflict is inherent — as where co-defendants share counsel in the same proceeding — the State has the burden of proving the absence of prejudice resulting from the conflict.[34] Where the conflict is attenuated — as where the same firm, but different attorneys, represent a defendant and a potential witness — it is the movant's "burden on appeal to prove (1) that the alleged conflict of interest really existed, and (2) that this conflicting interest actually affected the defense attorney's representation of the defendant."[35]

Dan's trial counsel had briefly been a post-termination GAL for Toby's cousins in their CINA proceedings in early 2009. Dan's trial counsel only began representing Dan shortly before Dan's termination trial. Dan argues this prior

---

[33]    *Newby v. State*, 967 P.2d 1008 (Alaska App. 1998).

[34]    *Id.* at 1012 (citing *Moreau v. State*, 588 P.2d 275, 284 (Alaska 1978)).

[35]    *Id.* at 1014 (citing *LaPierre v. State*, 734 P.2d 997 (Alaska App.1987)). The superior court applied this test, and neither party challenges the use of this test, only its application.

representation created a conflict under Alaska Rule of Professional Conduct 1.7(a)(2),[36] 1.9(a),[37] and 1.4.[38]

### b.  Rule 1.7(a)

Dan argues that under Rule 1.7(a) there was a significant risk his trial counsel's representation would be materially limited by her prior duty to advance the best interests of Toby's cousins. Dan reasons her prior advocacy for the cousins against placement with Hugh and Sophie limited her advocacy for Toby's placement with Hugh and Sophie. There are three problems with his argument. First, although trial counsel sent an email in her capacity as GAL stating she had "the scoop" on Hugh and Sophie, her testimony indicates she had a limited role in the cousins' case and never took a position on their placement with Hugh and Sophie. Second, there is no indication that trial counsel had any continuing responsibilities to Toby's cousins. Third, trial counsel never represented Dan in a placement review hearing, only at the termination trial where

---

[36]  In relevant part, Alaska R. Prof. Conduct 1.7 provides: "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a former client . . . ."

[37]  In relevant part, Alaska R. Prof. Conduct 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . ."

[38]  Alaska R. Prof. Conduct 1.4(a) states: "A lawyer shall keep a client reasonably informed about the status of a matter undertaken on the client's behalf and promptly comply with reasonable requests for information. A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

placement was not at issue.[39]  We conclude there was no conflict under Rule 1.7(a).

### c.     Rule 1.9(a)

Dan next argues that under Rule 1.9(a), the cousins' case and Toby's case were "substantially related" and Dan's interests and the cousins' interests were "materially adverse."  A claim of conflict under Rule 1.9 contains two inquiries:  (1) are the current and prior matters substantially related;[40] and (2) are the interests of the current client and the former client materially adverse.[41]

Dan argues the two cases were substantially related based on the close grandparent and grandchild relationship in each case.  We find no authority for the proposition that mere commonality of a relative between parties in separate cases makes those cases "substantially related."  Toby's case and the cousins' case do not involve the same transaction or legal dispute, nor is there risk that information from the cousins' case would hinder Dan's position.  The only common fact between the two cases is the 2005 removal of Toby's cousins from Hugh and Sophie when Toby and Dan were present.

---

[39]     *See David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, __ P.3d __, Op. No. 6628 at 39, 2011 WL 6347722, at *18 (Alaska Dec. 16, 2011) ("Even if trial counsel did fail to pursue placement with [a grandparent], that is not relevant to a claim that he provided ineffective assistance in [the parent's] termination proceedings.").

[40]     Alaska R. Prof. Conduct 9.1(q) defines "substantially related" matters as "matters:  (1) that involve the same transaction or the same underlying legal dispute, or (2) where there is a substantial risk that confidential factual information obtained in the prior matter would materially advance a client's position in the subsequent matter." *See also Daniels v. State*, 17 P.3d 75, 81 n.2 (Alaska App. 2001) (collecting cases describing "substantially related" tests).

[41]     *Richard B. v. State, Dep't of Health & Soc. Servs., Division of Family & Youth Servs.*, 71 P.3d 811, 818-19 (Alaska 2003) (underlying criminal case and subsequent CINA case were substantially related; interests of mother and father were materially adverse).

The legal dispute in Dan's case was the termination of his parental rights; the legal dispute in Toby's cousins' case was their post-termination placement.

### d.    Rule 1.4

Dan also argues Rule 1.4's requirement to keep a client "reasonably informed" obligated his trial counsel to disclose her prior role as GAL. But even if Rule 1.4 adds disclosure obligations regarding conflicts beyond those imposed by Rules 1.7 - 1.9,[42] as discussed above Dan's trial counsel did not have a conflict of interest — Rule 1.4 cannot create a duty to disclose a non-existent conflict.[43]

### e.    Discovery issues

Finally, Dan argues the superior court erred in denying him access to Toby's cousins' CINA records. Dan wanted the records to discern any conflict his trial counsel may have had. Specifically, he wanted to investigate whether trial counsel was biased against Hugh and Sophie and therefore had not advocated for Toby's placement with them. The superior court denied release of the records.

On appeal Dan contends the superior court abused its discretion in denying him in camera review of the records. He argues that under *Matter of A.B.*[44] the superior court had the authority to release the records, consistent with CINA Rule 22(a).[45] But

---

[42]    Such a disclosure obligation is not readily apparent from Rule 1.4's text, but under "Explaining Matters" the Commentary notes that "when a lawyer asks a client to consent to a representation potentially affected by a conflict of interest, the client must give informed consent."

[43]    *Cf. In re Disciplinary Proceeding Against Halverson*, 998 P.2d 833, 841 (Wash. 2000) (holding same failure to disclose that violated Washington Rule of Professional Conduct 1.7 also violated Washington Rule of Professional Conduct 1.4).

[44]    791 P.2d 615, 621-22 (Alaska 1990).

[45]    CINA R. 22(a) allows a court to release CINA records "for good cause (continued...)

Dan wanted the information to investigate conflict "with regard to placement or contact with [Hugh and Sophie] in the cousins' case." As discussed above, those placement issues were irrelevant to Dan's termination trial.[46] Although an in camera inspection may have been a more cautious alternative, the superior court did not abuse its discretion in denying inspection of the records.[47]

### 3. Conclusion

We therefore uphold the superior court's denial of Dan's Civil Rule 60(b) motion.

## V. CONCLUSION

We AFFIRM the superior court's decision terminating Dan's parental rights.

---

[45] (...continued) shown." *See also* AS § 47.10.090(e) ("The court's official records under this chapter may be inspected only with the court's permission and only by persons having a legitimate interest in them.").

[46] The superior court also noted that any information in the cousins' records concerning Hugh and Sophie would be cumulative to the information contained in Toby's own file. A court's failure to permit otherwise relevant discovery is harmless error where the evidence is cumulative. *Braham v. State*, 571 P.2d 631, 648 (Alaska 1977).

[47] Our conclusion that there was no conflict makes it unnecessary to consider conflict-related prejudice.